IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **IDRIS ABDUS-SHAHID,** | * | |
| Plaintiff, | * | |
| v. | * | **Civil No. 1:22-cv-2367-CDA** |
| **MAYOR & CITY COUNCIL OF** | * | |
| **BALTIMORE CITY, *et al.*,** | * | |
| Defendants. | * | |
| | * | |

\* \* \*

**<u>MEMORANDUM OPINION</u>**

THIS MATTER is before the Court on the Motion for Summary Judgment filed by Defendants Mayor & City Council of Baltimore City, Bimal Devkota, and Nicholas Fontanez (collectively, "Defendants'"). ECF 72. Plaintiff Idris Abdus-Shahid filed this lawsuit alleging retaliation, discrimination, tortious conduct, and failure to pay wages. *See* Compl., ECF 1; Third Amend. Compl., ECF 60 ("TAC"). Defendants seek dismissal of all fourteen counts. The parties fully briefed the issues and presented oral arguments. *See* ECFs 72, 78, 81-82. For the reasons stated below, the Court **GRANTS** the Motion for Summary Judgment.

## I.   FACTUAL BACKGROUND

This case involves myriad factual disputes relating to Idris Abdus-Shahid's employment with the Baltimore City Department of Transportation ("DOT"). Plaintiff has been employed with DOT since January 14, 2008. Defendants' Mot. for Summ. J., ECF 72-1 ("MSJ"), at 4; MSJ Ex. 4, ECF 72-7, at 2; Deposition of Idris Abdus-Shahid, ECF 72-8 ("Abdus-Shahid Dep."), at 12:20-13:1. Due to the nature of the arguments and

contentions, it is necessary to wade through a dense, intertwined, and disputed factual record.

### A. Plaintiff joins the Baltimore City Department of Transportation as a Construction Project Supervisor.

Until July 2024,[1] Plaintiff worked as a Construction Project Supervisor II ("CPS-II") in the Transportation Engineering and Construction ("TEC") Division[2]. MSJ at 4-5, 5 n.2; Abdus-Shahid Dep. at 11:4-9, 12:20-13:1; Affidavit of Kirkland Gabriel, ECF 72-6 ("Gabriel Aff."), at ¶ 13; MSJ Ex. 19, ECF 72-22, at 13, 16. The TEC Division "oversees external paving and related projects that are completed by outside contractors, as opposed to [] internal projects completed by DOT Maintenance staff." MSJ at 5. Expected to work primarily from an office but with visits to active construction sites, the CPS-II position focuses on "oversee[ing] and coordinat[ing] the implementation of all construction contracts assigned" to the employee's section and "directing inspection work units." MSJ Ex. 6, ECF 72-9; Plaintiff's Opposition Ex. 6, ECF 78-6 ("Opp'n"). Examples of specific job duties include (but were expressly not limited to) (1) coordinating with other participants and stakeholders (e.g., contractors, government agencies, and utility companies) involved in implementation of construction contracts for projects such as roads, bridges, and mechanical or electric utility systems, (2) reviewing, and approving construction contracts as well as implementing and monitoring plans and procedures related to the projects, (3) authorizing adjustments to

---

[1] Since a July 1, 2024 transfer, Plaintiff serves as a CPS-II in DOT's Conduit Division. MSJ at 5 n.2.

[2] Within TEC are various sections focusing on different types of projects such as bridges, "[s]treetscape," resurfacing, alleyways and footways. Affidavit of Bimal Devkota, ECF 72-4 ("Devkota Aff."), at ¶ 4.

work orders, (4) resolving issues that arise during implementation and investigate complaints lodged against the City by contractors, (5) managing project workflow as well as subordinates' performance and training, and (6) performing "related work as required." *Ibid.* The position also requires certain levels of knowledge and abilities regarding construction methods, materials, and contract administration; an ability to supervise or otherwise manage relationships and coordination among various contractors, City employees and departments, and other participants in projects; an ability to perform various tasks and responsibilities using computer software; and certain education and experience requirements. *Ibid.* In his own words, Plaintiff summarizes his position as "supervis[ing] construction projects" assigned to the TEC Division section that covers "resurfacing and [traffic signals.]" Abdus-Shahid Dep. at 12:5-19. He received a salary of $89,621 in 2019; $100,296 in 2020; $102,301.92 in 2021; $104,947.96 in 2022; and $107,478.40 in 2023. MSJ Ex. 4 at 18-19, 21-22. His payroll records mark him as an exempt employee. *Id.* at 3.

Plaintiff supervised approximately 30 inspectors and up to five CPS-Is, including Derek Proctor, Kenneth Suggs, and Jessica Lewis. MSJ at 5; Abdus-Shahid Dep. at 13:5-21; Devkota Aff. at ¶ 14; Affidavit of Nicholas Fontanez, ECF 72-5 ("Fontanez Aff."), at ¶ 8; MSJ Ex. 16, ECF 72-19, at 11; MSJ Ex. 19, at 13, 15. Plaintiff supervised Proctor and Suggs until his transfer to a different department. MSJ at 5; Abdus-Shahid Dep. at 13:5-14. Plaintiff supervised Lewis from as early as February 2012 through May 2013; due to allegations of racial and gender discrimination against Plaintiff, Lewis and the City reached a settlement agreement that, among other things, assigned Kirkland Gabriel as

3

her supervisor.  *See* MSJ Ex. 19 at 2-3, 7-22.[3]  Less than a month later, the City notified certain TEC supervisors of the change.  *See id*. at 3.  Plaintiff insists that Lewis "was transferred within days and given three week paid leave for the stress she endured," a contention Defendants dispute.  TAC at ¶ 33; Devkota Aff., at ¶ 14.

During the relevant time, Plaintiff had three supervisors: Kirkland Gabriel, Bimal Devkota, and Jamie McDonald.  MSJ at 5; Abdus-Shahid Dep. at 13:2-4; Devkota Aff. at ¶ 13; MSJ Ex. 16 at 4; Opp'n Ex. 3, ECF 78-3, at 2, 6.  Of those three, only Devkota is named as a defendant.  Gabriel joined DOT in 1997 and worked as a TEC Division Engineer Supervisor, while Devkota joined in 2005 and served as Chief of the TEC Division.  Devkota Aff. at ¶ 2; Gabriel Aff. at ¶¶ 2-3; MSJ Ex. 8, ECF 72-11, at 35; MSJ Ex. 10, ECF 72-13, at 18, 95; MSJ Ex. 13, ECF 72-16, at 2, 4; MSJ Ex. 14, ECF 72-17, at 3, 36.

Until Plaintiff's transfer, Gabriel supervised Plaintiff directly,[4] with Devkota serving as Plaintiff's second-level supervisor.  MSJ at 5.  As a TEC Division Engineer Supervisor, Gabriel oversaw CPS-IIs and CPS-Is in the TEC Division.  Gabriel Aff. at ¶ 3. He also directed activities concerning planning, designing, and estimating costs, among other things.  Opp'n Ex. 2, ECF 78-2, at 7.  Gabriel was responsible for Plaintiff's annual performance reviews.  MSJ Ex. 4 at 41.

---

[3] Lewis filed a complaint with DOT's Office of Equal Employment Opportunity Compliance on April 18, 2013.  *See* MSJ Ex. 19 at 7-10.

[4] Although payroll records show that Gabriel began managing Plaintiff in October 2020, Gabriel believes that role began as early as 2014.  *Compare* Gabriel Aff. at ¶ 4 *with* MSJ Ex. 4 at 3.

### B. Plaintiff's accusation of religious and racial discrimination by supervisors.

Plaintiff alleges that during their 17-year working relationship, Devkota "has represented himself . . . as a Hindu man from [the] India/Nepal region of the world where an Indian caste system is practiced that discriminates against darker skinned people and see darker skinned people as lesser human beings than lighter skinned people." Opp'n Ex. 9, ECF 78-9. He accuses Devkota of "exhibit[ing] knowledge and understanding of the historically documented hatred between Hindus and Muslims." *Id.* Devkota identifies his native country as Nepal, not India, and insists that Plaintiff has known this.[5] MSJ at 5 n.3; Devkota Aff. at ¶ 3.

Plaintiff offers two March 14, 2022 examples of Devkota's prejudice and racism toward him. First, Plaintiff claims that Devkota denied a request for out-of-title pay and then asked whether Plaintiff knew he was "the highest paid black CPS-II.'" Opp'n Ex. 10, ECF 78-10, at ¶ 1. Devkota does not recall this conversation but recalls a late 2019 conversation regarding Plaintiff's request for a raise that occurred in 2020—the last time, according to Devkota, that the City "did Pay-for-Performance raises." Devkota Aff. at ¶¶ 7-10; *see also* MSJ Ex. 4 at 19 (reflecting Plaintiff's 2020 salary increased approximately $8,00 from the 2019 level). Second, Plaintiff contends that during a discussion regarding Ms. Lewis' discrimination complaint, Devkota stated, "I'll be your lawyer on this one, she's white your black [sic] you can't win, [I'm] transferring her to Kirk." Opp'n Ex. 10 at ¶ 2. Devkota denies making this statement and says that the

---

5 The record includes Plaintiff's June 2021 emails referring to Devkota as "the son of Devkota (from the mountains of Nepal)[.]" MSJ Ex. 8 at 38, 56.

transfer resulted from the settlement agreement, not any decision he made.  Devkota Aff. at ¶ 14-15.

Plaintiff also insists that McDonald discriminated against him on religious grounds, including McDonald denying Plaintiff's ability to conduct daily Islamic prayers while on the clock or on City property.  *See* TAC at ¶ 31.  Plaintiff contends that Devkota knew of and, at times, directed McDonald's denial of Plaintiff's religious exercise.  Opp'n Ex. 10 at ¶ 3.  Devkota recalls Plaintiff reporting an incident in 2013 or 2014, that McDonald received counseling regarding the matter, and that McDonald "acknowledged that he was not familiar with the religious practice and the fact that it was permissible during work hours."  Devkota Aff. at ¶ 13.

### C. Plaintiff's assignment to Operation Orange Cone, an effort to provide regular data updates for public disclosure.

In April 2020, Gabriel asked Plaintiff to update his projects in Operation Orange Cone, "a spreadsheet that is maintained monthly and encompasses all roadway resurfacing work by DOT within a calendar year."  Gabriel Aff. at ¶ 5.  The spreadsheet included data related to various projects, including the scope, costs, relevant legislative district, limits on work, and status such as whether it is in the planning or construction stages or completed.  *Id.*  DOT sought regular updates due to the data being published monthly on DOT's website.  *Id.*  Defendants contend such information was a matter of public interest and received attention from local media.  MSJ at 5; MSJ Ex. 8 at 30.

Gabriel directed Plaintiff to update the spreadsheet regarding TEC matters, which included data regarding, among other things, resurfacing lane miles.  Gabriel Aff. at ¶ 6; MSJ Ex. 7, ECF 72-10, at 61.  Gabriel viewed Plaintiff as the appropriate person for this task due to Plaintiff being the supervisor for "all external resurfacing contracts

6

for DOT" and thus would be aware of—and best positioned to update—the information for the relevant projects. Gabriel Aff. at ¶ 6-7. Plaintiff does not dispute having received the Operation Orange Cone assignment. Rather, he maintains that the assignment carried a different job classification that he should have received in addition to being a CPS-II: because the assignment required calculation and management of Operation Orange Cone data—a task he believed beyond the CPS-II job description—he was acting as a Project Manager, which DOT classified as an Engineer II. Opp'n Ex. 2 at 5-6; *see also* TAC at ¶¶ 4-10.

In May 2020, DOT sought updates to Operation Orange Cone data. MSJ Ex. 7 at 18-20. Bineeta Sihota, a DOT employee from a different department, emailed Plaintiff, Devkota, and Gabriel, asking who was in charge of providing information for the spreadsheet. *Id.* at 18. Gabriel directed Sihota to Plaintiff; Sihota sent Plaintiff a link to the spreadsheet, sought confirmation of the information in it, and asked him to notify her when the 2020 data was updated. *Id.* at 17-18. In response, Plaintiff indicated that his attempts to open the spreadsheet were unsuccessful. MSJ Ex. 7 at 17; Opp'n Ex. 4, ECF 78-4, at 4. A week passed without updates. MSJ Ex. 7 at 8-9; Opp'n Ex. 1, ECF 78-1, at 7. Another DOT employee, German Vigil, sought an update from Sihota and Gabriel on the status of the Operation Orange Cone information. *See* MSJ Ex. 7 at 8-9. The three exchanged messages in an attempt to determine when the updates would be ready; Sihota indicated she was still waiting for Plaintiff to provide updates and despite having spoken with him the previous week. MSJ Ex. 7 at 8-11. The next day, Plaintiff emailed Sihota and indicated that because he could not open the spreadsheet on his phone, he would provide verbal updates so that Sihota could update the document. MSJ Ex. 7 at 17; Opp'n Ex. 4 at 4.

Plaintiff and Sihota spoke by phone on May 28, 2020. MSJ Ex. 7 at 5; Opp'n Ex. 1 at 3. The following day, Sihota informed Gabriel, Vigil, and David Nafisi (manager of DOT's Information Technology Division) that Plaintiff lacked access to a computer and that certain tasks could not begin before receiving a final, updated document. *Ibid.* Gabriel directed Plaintiff to contact Nafisi to receive a laptop so Plaintiff could work from home. MSJ Ex. 7 at 7. In response, Plaintiff asked whether the laptop had remote internet access, access to his office desktop, and "primavera." *Id.* Nafisi expressed surprise to Sihota, Gabriel, Vigil, and Eric Williams, an IT Division systems administrator, that Plaintiff lacked "proper resources to perform his job duties." *Id.* at 5. In turn, Vigil and Gabriel expressed shock and requested that Williams assist as soon as possible. MSJ Ex. 7 at 4; Opp'n Ex. 1 at 4. Williams advised the same group that he prepared a rebuilt desktop for Plaintiff because no laptops were "readily available." MSJ Ex. 7 at 4.

On June 15, Plaintiff again requested a laptop. *Id.* at 7. In response to Gabriel's inquiry on why this process took so long, Nafisi explained that he advised Plaintiff on June 10 that a desktop was available yet Plaintiff insisted on a laptop. *Id.* Nafisi advised that loaner laptops were unavailable and that had Plaintiff sought one sooner, the request would have been prioritized as part of shutdown preparations in response to the COVID-19 pandemic. *Id.* ("His request comes almost 70 days later when there are no more loaner laptops [] available[.]"). Nafisi further instructed that if Plaintiff wanted a laptop, he could complete certain paperwork supporting that request but Nafisi could not guarantee that a laptop would be available and assigned to Plaintiff. *Id.* Gabriel then asked Plaintiff why he had not picked up the desktop. *Id.* at 10. Plaintiff provided Devkota, Gabriel, and Nafisi three reasons: (1) avoiding contracting COVID-19, (2) he

8

made a specific request for a laptop with wireless internet and remote access to his desktop, and (3) he could not complete his Operation Orange Cone tasks if the second desktop computer lacked these capabilities. *Id.* Within hours, Nafisi expressed disappointment in Plaintiff's response, emphasizing Plaintiff's refusal to pick up the desktop computer and reminding Plaintiff that the request should have occurred "7 weeks ago" during telework transition preparations. *Id.* at 48. The next day, Gabriel expressed frustration regarding the delays in updating the Operation Orange Cone data:

> Why is this information taking so long to retrieve? As the CPS-II, this information should be readily available. It seems as if you aren't trying to work with me during this tough process. As a leader of a construction team, I would expect more from you being as though we are in a pandemic and short staffed. I have assigned a task to you in April and it still hasn't begun. This is creating an issue, and it has now raised the eyebrows of many and now [Devkota] is questioning what your responsibilities have been.

> [Devkota] wants you to answer: You need to know how Idris was fulfilling his CPS-II duty. Simply sending an email every morning 'I am teleworking today' is not enough for his title. He never told us that he had no computer at home until recently and he is refusing to pick up the equipment he needed to do his job. Was he going to field like other TEC CPS-II are doing? Based on these emails, he is not doing his job. Please ask him details of how he was performing his duties.

*Id.* at 13. In response, Plaintiff maintained that he completed his CPS-II duties required by the telework policy and complied with the policy by sending daily notice to Gabriel and Devkota about when he was teleworking. *Id.* at 14. Plaintiff denied accusations that he improperly refused work. *Id.* In his view, he went "above and beyond"—despite being ineligible for hazard pay—in completing tasks and visiting construction sites assigned to him. *Id.*

In a June 22 email, Devkota expressed both his disapproval of Plaintiff's refusal to pick up the available technology to complete critical assignments and his frustration with Plaintiff's delays amidst the existing challenges created by the adjustment to the

COVID-19 pandemic. *Id.* On June 24, Plaintiff emailed Sihota, again asking Sihota for time to speak by phone so he could provide verbal updates for the Operation Orange Cone project data for her to input. MSJ Ex. 7 at 16; Opp'n Ex. 4 at 3. On June 29, Sihota emailed Plaintiff, Gabriel, and Nafisi, inquiring whether Plaintiff picked up the desktop and informing Plaintiff that phone updates were unacceptable, data had to be delivered through the existing process of updating the spreadsheet, and the GIS team would not shoulder responsibility for late updates. *Ibid.*

The following month, a member of DOT's Department of Finance requested certain data for inclusion in its annual financial report. *See* MSJ Ex. 7 at 24-26. Devkota provided data for one section but lacked knowledge of data pertaining to resurfacing lane miles. MSJ Ex. 7 at 24, 26. Uttam Khadka, an engineer, advised that Plaintiff could provide the data. *Id.* at 24. Devkota asked Plaintiff to do so. *See id.* at 27. To aid his research, Plaintiff sought and received access to Operation Orange Cone lists created by previous project managers. *See id.* Plaintiff provided data to Devkota and Gabriel the next day but warned that the data was "an extrapolation," rather than precise numbers; that he was pressed for time; and that he had issues accessing previous lists. *Id.* at 32. Gabriel reiterated that it was "imperative" Plaintiff provide accurate lane mile data and track it monthly. *Id.* at 36. In late September 2020, Sihota informed Gabriel that the Operation Orange Cone information was not updated because Plaintiff had yet to provide it in the correct format. MSJ Ex. 7 at 51-52. Sihota claimed to have copied Plaintiff on any email she sent concerning Operation Orange Cone updates during that construction season. *Id.* at 51.

10

### D. DOT denies Plaintiff's request for additional, out-of-title pay in connection with Operation Orange Cone.

In October 2020, Plaintiff sought additional compensation in the form of "out of title pay,"[6] as well as a "proper" meeting to discuss the "new assignment of Project Manager" of Operation Orange Cone, including its scope and responsibilities.  MSJ Ex. 7 at 45; Opp'n Ex. 8 at 3-4.  Plaintiff claimed out-of-title pay because an Engineer II performed project manager duties for at least the prior eight years and no CPS-II performed project manager tasks for Operation Orange Cone.  *Ibid.*  Devkota denied the request, explaining that the requested Operation Orange Cone updates fell within the scope of Plaintiff's CPS-II duties.  MSJ Ex. 7 at 61; Opp'n Ex. 8 at 3.  Before Devkota's decision, Gabriel identified instances of Plaintiff's unsatisfactory performance of his job duties.  *See* MSJ Ex. 7 at 47-62.  Devkota noted that Gabriel assigned Plaintiff the Operation Orange Cone responsibility in May 2020.  MSJ Ex. 7 at 61; Opp'n Ex. 8 at 3. He further noted the failures to obtain the necessary technology to allow him to complete work after the transition to remote work as well as the failures to respond timely with Operation Orange Cone updates.  *Ibid.*  Within a week of Devokta's denial, Plaintiff emailed Devkota, Gabriel, and Steve Sharkey, Director of DOT, appealing this denial and requesting resolution via arbitration.  MSJ Ex. 7 at 63; Opp'n Ex. 8 at 2-3. Sharkey directed Plaintiff to confer with Nicholas Fontanez, Chief of DOT Human Resources.  MSJ Ex. 7 at 67-68; Fontanez Aff., at ¶ 2.  Plaintiff later accepted and then revoked a calendar invite to a November 19 meeting with Gabriel via the Microsoft

---

[6] DOT's out-of-title pay policy provides for "out-of-title compensation" where four conditions—including assignment to the job duties of a higher class of labor employee— are satisfied.  MSJ Ex. 11, ECF 72-14, at 2-3.

Teams videoconference platform.  *See* MSJ Ex. 7 at 66-67.  Plaintiff revoked his acceptance upon learning that the meeting would involve updates about the Operation Orange Cone data rather than the denial of his pay request.  *Id*. at 67.

In late 2020, DOT personnel took steps to address what they believed to be Plaintiff's subpar performance.  Devkota noted that although Plaintiff was to provide updates reflecting the agency's accomplishments, his estimates—rather than precise data—fell short of expectations.  In December 2020, because Plaintiff was not updating Operation Orange Cone information, Gabriel contacted Proctor, Suggs, and Khadka about compiling a summary of completed work.  *Id*. at 71.  A month later, Devkota and Gabriel again found Plaintiff's Operation Orange Cone updates insufficient and expressed their disapproval.  *See* MSJ Ex. 8 at 8-15.  Plaintiff's assignment concerned data that could highlight the agency's recent accomplishments.  *Id*. at 13.  Plaintiff provided data based on estimates, which, according to Devkota and Gabriel, were unacceptable and improper.  *Id*. at 11.  Reiterating that specific updates fell within CPS-II responsibilities, Gabriel demanded immediate corrections to the data.  *Id*. at 11, 14.

### E.  Plaintiff receives written reprimands and pursues relief through DOT's grievance process.

At various points during the relevant period, Plaintiff filed grievances concerning discipline or other supervisory actions that Plaintiff believed were improper.  City policy provided a four-step grievance process, defining a grievance as a dispute regarding, among other things, a violation, misapplication, or misinterpretation of governing laws, regulations, or memoranda of understanding governing the terms and conditions of employment.  MSJ Ex. 12, ECF 72-15, at 1 (grievance policy document).  The policy outlined who could file a grievance, and, relevant to certain assertions noted below,

12

prohibits retaliation for filing a grievance or otherwise engaging in interference or coercion regarding an ongoing grievance process. *Id.* at 4. In short, the four steps to the process are (1) discussion between the employee and immediate supervisor within ten calendar days (or, in any event, no more than 30 days) after becoming aware of the challenged action; (2) appeal within five days to a second-level supervisor, who must discuss with the employee within five days of receipt; (3) appeal to the agency head, who must meet with the Labor Commissioner and employee within five days of receipt; and (4) appeal to the final level of review, which was either an appeal board or an independent arbitrator.[7] *Id.* at 5-6.

Certain matters were not subject to grievances, which led to additional disputes between Plaintiff and other personnel. *See id.* at 2 (noting exceptions). For example, on August 26, 2020, Devkota sent Plaintiff his annual evaluation and requested a signature. MSJ Ex. 7 at 45-46; Opp'n Ex. 8, ECF 78-8, at 4-5. Plaintiff previously failed to respond to Gabriel's email containing the evaluation and requesting Plaintiff's signature. MSJ Ex. 7 at 61; Opp'n Ex. 8 at 3. In response to Devkota, Plaintiff refused to sign and then appealed the evaluation. MSJ Ex. 7, ECF 72-10, at 46; Opp'n Ex. 8 at 5. He "vehemently opposed" an evaluation grade lower than the previous year; he maintained that he had not been disciplined or been told at his mid-year review that his performance declined. *Ibid.*; *see* Opp'n Ex. 11, ECF 78-11. Devkota informed Plaintiff he could not appeal any

---

[7] The forum for the final appeal depended on who represented the employee in the grievance process. If they were self-represented or represented by someone within the agency where the grievance originated, the fourth step involved a Grievance Appeals Board comprising certain civil service personnel. In cases involving representation by an employee organization designated by the relevant collective bargaining agreement, the fourth step involved an impartial arbitrator selected jointly, if possible. MSJ Ex. 12 at 5-6.

grievances with the review.  MSJ Ex. 7 at 61; Opp'n Ex. 8 at 3.  This would not be the last attempt to pursue a grievance on this issue.

Several relevant disciplinary actions and grievances occurred beginning in early 2021.  On February 2, 2021, Gabriel issued Plaintiff a written reprimand for violating Civil Service Commission Rules 40(A) and 56(2)(b).  *See* MSJ Ex. 13 at 2-3.  Rule 40(A) requires employees to perform their duties in accordance with reasonable standards, and Rule 56(2)(b) concerns "incompetent, inefficient, or negligent" performance of duties.  MSJ Ex. 13 at 2.  Signed by Gabriel, Devkota, and Katie Dunning-McCourt (a DOT human resources representative), the reprimand cited, among other things, Plaintiff's provision of estimated, rather than precise, data; failure to secure funds addressing a potential shortfall in a project; "documented negligence in monitoring" contracts, including failures to communicate regarding contractor schedules and obligations; and refusal to attend the aforementioned November 2020 meeting with Gabriel and human resources.  MSJ Ex. 13 at 3-4.  The reprimand warned that further discipline—including termination—could occur if these issues persisted.  *Id*. at 5.  It also notified Plaintiff about the Baltimore Employee Assistance Program ("EAP") available for those who sought confidential, professional support for personal matters.  *Id*.[8] Plaintiff also requested a meeting with Gabriel to contest the written reprimand.  MSJ Ex. 8 at 23; Opp'n Ex. 13, ECF 78-13, at 2.  Almost three weeks later, he sought a meeting with Devokta for the same reason.  MSJ Ex. 8 at 22.  Gabriel responded in less than an hour, inquiring why Plaintiff had not sent notice of potential funding shortfalls

---

[8] Unless otherwise noted, all other written reprimands or suspensions carried similar language regarding both EAP and the potential for future discipline if the cited conduct or violations continued.

for contracts he was responsible for monitoring. *Id.* at 27. In response, Plaintiff asked HR Chief Fontanez to arrange a conference to discuss with Gabriel and Devkota what he believed to be interference and harassment based on his filing a grievance.[9] *Id.* at 26-27. Plaintiff also sought rescission of the reprimand and corrective action to address his grievances. *Id.* at 26. Fontanez directed Plaintiff to schedule a meeting with Devkota. *Id.* at 27. Separate from these efforts, Plaintiff appealed this reprimand through the grievance process, which concluded with a denial at the fourth step after an August 2022 hearing. MSJ at 10-11; MSJ Ex. 14 at 14-16.

In March 2021, Devkota attempted to schedule a meeting involving him, Plaintiff, and Gabriel on March 8. MSJ Ex. 8 at 22; Opp'n Ex. 17, ECF 78-17, at 7-8. Plaintiff inquired again whether human resources would respond to Gabriel's interference with Plaintiff's ongoing employment grievance. MSJ Ex. 8 at 26; Opp'n Ex. 15, ECF 78-15, at 2. Fontanez asked how Gabriel's email amounted to discipline in retaliation for the grievance. MSJ Ex. 8 at 25. Instead of explaining, Plaintiff pressed again for a meeting with Fontanez and Devkota. *Id.*

On March 22, 2021, Gabriel sent a second written reprimand for violating Rules 40(A) and 56(2)(b). *See* Opp'n Ex. 16, ECF 72-16, at 6-7. Signed by only Dunning-McCourt, this reprimand cited Plaintiff's negligence in addressing his communication failures related to contract management and monitoring funding. Opp'n Ex. 16 at 6-7.

---

[9] Plaintiff claimed that management violated certain policies and, in doing so, caused irreparable harm to his grievance procedure. MSJ Ex. 8 at 26-27. Fontanez disagreed. *See id.* Around the same time, Plaintiff inquired about the EAP and began receiving weekly mental health treatment. *See* Opp'n Ex. 14, ECF 78-14; *see also* Opp'n Ex. 16, ECF 78-16 (demonstrating doctor's visit on June 21, 2022 to address a "mood disorder"); TAC at ¶ 25 (alleging severe anxiety and related symptoms caused by retaliation and harassment at work).

15

Again, it warned that discipline could follow future issues and notified Plaintiff of EAP. *Id*. at 7.  Plaintiff filed a grievance regarding this reprimand.  *See* MSJ Ex. 14 at 3-11. Plaintiff's grievance was upheld at the third step because management failed to follow the grievance procedure: Gabriel did not recall ruling on the first step, Devkota failed to follow policy regarding the second step, and none of the three signed the disciplinary memorandum.  MSJ, at 11; MSJ Ex. 14 at 3-11.  Protocol violations aside, however, the decision noted that Defendants "would have had sufficient grounds to discipline" Plaintiff.  MSJ Ex. 14 at 9.

In April 2021, after a request from another department, Plaintiff refused to update the Operation Orange Cone information, despite Devkota and Gabriel reiterating his responsibility to report updates.  MSJ Ex. 8 at 30-36.  Plaintiff refused because his grievance was pending and, he alleged, Gabriel interfered with that process.  *Id*. at 35.

## F.  The City denies Plaintiff's May 2021 transfer request but offers to help him look for openings.

As part of his claims, Plaintiff insists that that Devkota purposely assigned Plaintiff to work with McDonald despite knowing McDonald's alleged prior religious discriminatory acts.  TAC at ¶¶ 30-31.  On May 5, 2021, Gabriel instructed Plaintiff, Proctor, and Suggs to track and advise McDonald of data related to ramps intended to satisfy requirements of the Americans with Disabilities Act.[10]  MSJ Ex. 8 at 45.  Plaintiff reminded Devkota of the past discrimination and asked him to remove McDonald, who made Plaintiff feel unsafe.  MSJ Ex. 8 at 43-44; Opp'n Ex. 21, ECF 78-21, at 2.  Devkota noted that McDonald worked for a contractor and, in any event, reported to another

---

[10] A May 7 email from Khadka to Plaintiff suggests that the division rotated this responsibility amongst different employees.  MSJ Ex. 8 at 44.

16

person.  MSJ Ex. 8, at 43; Opp'n Ex. 21 at 4.  Plaintiff again sought McDonald's reassignment; Devkota declined because McDonald's supervisor was satisfied with McDonald's work and McDonald was directed not to contact Plaintiff.  MSJ Ex. 8 at 40-43; Opp'n Ex. 21 at 3-5.  At oral argument, the parties confirmed that although some emails involving McDonald may have copied Plaintiff as one of multiple recipients, there were no instances of McDonald attempting direct contact with Plaintiff.  *See* MSJ Ex. 8 at 41.

Around the same time, Plaintiff sought a transfer to a different department and rescission of the March 22 reprimand.  MSJ Ex. 8 at 58; Opp'n Ex. 22, ECF 78-22, at 13. This was the first of multiple transfer requests made between May 12, 2021 and January 24, 2022.  *See* MSJ Ex. 8 at 53-58; Opp'n Ex. 22 at 5-13.  On the matter of rescission, Plaintiff asked that the February 2 reprimand be rescinded.  MSJ Ex. 8 at 57; Opp'n Ex. 22 at 12.  Devkota explained that such a request was a human resources decision, but a human resources representative said it was Devkota's.  MSJ Ex. 8 at 54-56; Opp'n Ex. 22 at 8-11.  Regardless of where the buck stopped, Plaintiff went nowhere.  At some point between June 21 and June 30, 2021, Plaintiff learned that his May 12 transfer request had been denied.  *Compare* MSJ Ex. 8 at 46 *with* Opp'n Ex. 22 at 6.  Devkota believed that such a move was not beneficial to DOT at the time.  MSJ Ex. 8 at 53; Opp'n Ex. 22 at 6.  Fontanez encouraged Plaintiff to seek opportunities in the Department of Public Works ("DPW") or other City agencies.[11]  MSJ Ex. 8 at 46-51; Opp'n Ex. 22 at 7.

---

[11] At least twice during the relevant period, Plaintiff explored potential transfers to other agencies.  In October 2022, Plaintiff applied to CPS-II opening at DGS after Fontanez brought the vacancy to his attention.  MSJ Ex. 9 at 50.  And in February 2023, Plaintiff interviewed with DGS for a CPS-II opening and expressed his belief, based on hearsay statements of Fontanez, that DOT agreed to pay his salary if DGS accepted Plaintiff's transfer from DOT.  Opp'n Ex. 64, ECF 78-64, at 2; Opp'n Ex. 67, ECF 78-67, at ¶ 1.  The

17

### G. Additional grievances, complaints about retaliation and harassment, and consecutive five-day suspensions without pay.

After Gabriel requested that Plaintiff signed a copy of his 2020 annual evaluation, Plaintiff pursued a grievance on August 16, 2021.  MSJ Ex. 8, at 52.  Plaintiff believed that Devkota lied by saying that an evaluation could not be appealed and explained that he refused to sign evaluations for the previous two years because he did not receive candid discussion about them.  *Id.* at 61.  To solve the issue, Plaintiff suggested transfer to a new department or agency, back pay, candid discussions during evaluations, and rescission of all prior disciplinary actions.  *Id.* at 63.  A representative from the Office of the Labor Commissioner responded, explaining that performance reviews were not subject to the grievance process.  *Id.* at 60.  A Labor Commissioner representative directed Plaintiff to speak with Fontanez.  *Id.*  However, Plaintiff accused Gabriel of harassment and interference, again requested a "formal and proper hand-off meeting" because he never had any responsibility like Operation Orange Cone, and continued to assert that the assignment exceed the limits of CPS-II work.  *Id.* at 92-94.

Through a series of emails to Sharkey, Fontanez, and Devkota in September 2021, Plaintiff discussed his grievances regarding Devkota and Gabriel disregarding his rights and lying to him, sought transfer and out-of-title pay, and demanded rescission of prior reprimands.  *See id.* at 68-69, 75-79, 91-92.  The same individuals exchanged emails about which matters were or were not subject to the grievance process per DOT policy.  *Id.* at 81085.  Fontanez also addressed Plaintiff's complaint about the lack of "Pay-for-

_____

record reflects an exchange between Fontanez and a DPW representative—not DGS— regarding the prospect of Plaintiff's transfer.  MSJ Ex. 10 at 70-72.  In this exchange, Fontanez revealed that Plaintiff received six disciplinary actions—with all but one being removed—and experienced issues with DOT management.  *Id.* at 70, 72.

Performance" raises, explaining that changes attendant to the COVID-19 pandemic caused DOT to stop such increases in 2020-21. *Id.* at 81.

On September 15, 2021, Plaintiff complained of retaliation, harassment, and hostile work environment to Kamau Makini, a Senior Compliance Officer for the City's Human Resources Department. *Id.* at 73, 83-84, 86-87. At first, Makini directed Plaintiff to file a complaint with Fontanez; after learning that Fontanez was a subject of the complaint, Makini directed Plaintiff to send his statement to her for investigation. *Id.* at 83. Plaintiff described alleged harassment between August 2020 and September 2021. *Id.* at 86-87.

On September 28, 2021, Gabriel issued two five-day suspensions without pay for violating Rules 40(A) and 56(2)(B). *See* MSJ Ex. 13 at 8-11. The first began on September 29, and the second on October 7. MSJ Ex. 13 at 8, 10. The notice also advised that Plaintiff would be on a performance improvement plan upon returning to work on October 15. *Id.* at 8. Both suspensions were signed by Gabriel, Devkota, and Dunning-McCourt. *Id.* at 9, 11. The first suspension cited Plaintiff's failure to act on issues pertaining to utility tickets from a contractor, causing delays in the contractor's work. *Id.* at 10. The suspension noted the unacceptability of a CPS-II's failure to communicate in a timely fashion. *Id.* The second suspension cited the failure to provide time sensitive updates regarding resurfacing projects. *Id.* at 8. Both notices highlighted Plaintiff's delayed reporting and failure to respond to inquiries—failures that "greatly hindered" the Department's work despite both numerous reminders of his duties and the prior disciplinary actions. *Id.* at 8, 10.

Plaintiff filed a grievance the same day. *See* Opp'n Ex. 27, ECF 78-27, at 2-3. Plaintiff's grievances were upheld at the third and fourth step, respectively. MSJ, at 12;

19

*see* MSJ Ex. 14 at 12-13, 17-19.  Both decisions noted DOT management's failure to communicate effectively with Plaintiff.  *See* MSJ Ex. 14 at 12-13, 17-19.  Again, however, the grievance decision noted the presence of "sufficient grounds to discipline" Plaintiff. MSJ Ex. 14 at 19.  Defendants assert that Plaintiff was reimbursed for both suspensions. MSJ at 12-13.

### H. Plaintiff returns to work, explores settlement, and seeks transfer.

After serving the suspensions and returning to work on October 15, 2021, Plaintiff revived his transfer request and initiated settlement negotiations.  *See* MSJ Ex. 8 at 100-02; MSJ Ex. 9, ECF 72-12, at 2-3, 6, 21, 25-34, 44, 49-50.  On November 12, 2021, Fontanez informed Plaintiff that he contacted other agencies to see whether a transfer was possible or if those agencies had any vacancies.  MSJ Ex. 8 at 99.  Within a week, Plaintiff proposed a settlement offer, requesting that his disciplinary actions be reduced or rescinded; management work diligently to transfer him; and "a reprieve of future disciplinary action from" Devkota and Gabriel until after transfer is complete.  *Id.* at 102.  In response, DOT management offered to reduce the suspensions, return lost wages from both suspensions, and work in good faith to effect Plaintiff's transfer to another department or agency.  *Id.* at 101-02.  DOT management declined all other proposed terms.  *Id.*  Plaintiff did not accept management's offer before it expired.  *See id.* at 101.

In late January 2022, Plaintiff asked Fontanez and Devkota for an update on his transfer request.  MSJ Ex. 9 at 2, 6.  Fontanez advised that several agencies explained they either did not have CPS-II positions at all or had no vacancies at the time.  *Id.* at 2. Fontanez asked two agencies to contact Plaintiff directly if an opportunity arose.  *Id.*  On

20

January 24, Gabriel emailed Plaintiff, Proctor, Fontanez, and Dunning-McCourt, asking to be included on emails to ensure compliance with all applicable personnel-related rules and procedures.  Opp'n Ex. 31, ECF 78-31, at 6.  The following day, Plaintiff filed a formal grievance regarding Gabriel's email, claiming the directive continued a pattern of harassment and bullying in response to his out-of-title pay requests and successful challenge to two disciplinary actions.[12]  *Id.* at 3-4.  On March 25, Fontanez sent Plaintiff's resume to be considered for a CPS-II position with the Department of General Services ("DGS").  MSJ Ex. 9 at 60.

On March 31, Devkota notified Plaintiff that he would have to report back to the office three days a week, as his March 2020 telework schedule was subject to recall.  Opp'n Ex. 32, ECF 78-32, at 5.  Plaintiff accused Devkota of bullying, considering that other co-workers allegedly had the option to work from home.  MSJ Ex. 9 at 23.

In April 2022, Plaintiff disputed his pay with Gabriel.  On April 21, Plaintiff sought compensation for four hours of overtime worked on April 9.  MSJ Ex. 9 at 18.  Gabriel advised that he could not approve the request because Plaintiff did not seek permission in advance but that he would approve future requests if Plaintiff sought permission in advance.  MSJ Ex. 9 at 20; Opp'n Ex. 33, ECF 78-33, at 7.  Devkota reiterated the need to obtain prior approval for overtime when possible.  Opp'n Ex. 33 at 9.  Plaintiff's request remained unapproved until August 5, 2022.  *See id.* at 3.  Recalling the Lewis situation, Plaintiff requested that Devkota designate a different supervisor as Plaintiff's direct report.  MSJ Ex. 9 at 21.

---

[12] On January 31, Plaintiff also contacted the mayor's office and complained of, among other things, the disciplinary actions and Devkota's failure to grant his transfer request. MSJ Ex. 9 at 5.

In the backdrop of these developments, settlement negotiations continued into spring 2022 without success. *See id.* at 13. Plaintiff met with Gabriel, Devkota, Johnson, and Beverly Woolford, a DOT-HR representative, twice in March. *Id.* at 16. On April 4, Woolford sent a proposed settlement agreement to Plaintiff. *Id.* at 14-15. The agreement proposed DOT's rescission of Plaintiff's September 28, 2021 five-day suspension; Plaintiff's rescission of disciplinary actions he issued to Proctor and Suggs; that DOT meet with Plaintiff to discuss and agree in writing to Plaintiff's Operation Orange Cone duties; and Plaintiff's withdrawal of his grievance regarding the February 2, 2021 written reprimand. *Id.* at 15. The agreement could not set precedent for any case required Plaintiff to waive his rights to seek further action or relief as to anything covered by the agreement. *Id.*

Responding three days later, Plaintiff criticized the document as an inaccurate recitation of his agreement with Devkota. *Id.* at 16. He demanded removal of the term related to the February 2, 2021 reprimand and sought confirmation that the terms regarding waiver/release and non-precedential value were standard. *Id.* After initial resistance, Fontanez agreed to remove the February 2, 2021 reprimand from Plaintiff's file. *Id.* at 28-31. Plaintiff sought additional terms beyond that amendment. *Id.* at 28-29. DOT forwarded the updated settlement agreement to Plaintiff on May 11 with a requirement that he respond by close of business the following day. *Id.* at 32-34. He did not. *Id.* at 34.[13]

---

[13] Because Plaintiff failed to respond, Deborah Moore-Carter, Labor Commissioner of DOT, notified Plaintiff that she would waive the third step of the grievance procedure, so that Plaintiff could proceed to the fourth step. MSJ Ex. 9 at 34. She noted that DOT scheduled and rescheduled a third-step hearing "several times" while attempting a global resolution of Plaintiff's outstanding disciplinary disputes. *Id.*

### I. Plaintiff files an EEOC charge—and less than two months later, is suspended fifteen days without pay.

On June 8, 2022, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging Gabriel engaged in racial discrimination and retaliation between February 1, 2022 and April 18, 2022. MSJ Exhibit 20, ECF 72-23, at 2. Plaintiff claimed that Gabriel's "harassment and bullying" included issuing four disciplinary actions and two five-day suspensions. *Id.* The EEOC issued a Notice of Right to Sue on June 27, 2022. *Id.* at 4-5. Plaintiff filed a formal complaint with DOT's internal EEO office in early July. MSJ Ex. 20 at 9.

On July 27, 2022, Devkota issued a fifteen-day suspension without pay for violating Rules 40(A) & (H) and 56(2)(a)-(b). *See* MSJ Ex. 13 at 12-13. Rule 40(H) requires employees to report work "accurately and honestly" and without obstructing verification into or investigation of such reporting. *Id.* at 13. Rule 56(2)(a) relates to violations of lawful orders and regulations as well as "act[s] of insubordination or serious breach of discipline which may reasonably be expected to result in loss or injury to the City or the public." *Id.* Signed by Devkota only, the notice indicated the suspension began the following day and that Plaintiff would return to work on August 18. *Id.* The document noted continued failures to communicate about and otherwise address a shortfall as well as the improper issuance of stop work orders to contractors, in violation of standard operating procedures. *Id.* at 12-13.

Plaintiff notified Devkota and Gabriel of his formal request to grieve this suspension; when neither responded after ten days, Plaintiff sought to move forward to the next step in the grievance process. MSJ Ex. 9 at 42-43. The Office of the Labor Commissioner responded and requested that Plaintiff allow them more time, but

Plaintiff declined because the timeframe for a decision expired under the grievance procedures without Plaintiff's agreement to an extension. *Id.* at 41. Plaintiff contacted the Office of the Labor Commissioner again on August 15, accusing it of extending his punishment and seeking reimbursement of back pay. *Id.* at 40. Plaintiff complained of Devkota's and Gabriel's refusal to respond to and meet with him about the grievance. *Id.* Fontanez and the Office of the Labor Commissioner explained it was proper for the supervisors to wait until Plaintiff returned from his suspension. *Id.* at 38-39; *see also* Opp'n Ex. 43, ECF 78-43, at 2-4. Two weeks later, Plaintiff accused Devkota and Gabriel of improperly extending his punishment by failing to act on a recently submitted leave request. MSJ Ex. 9, at 37, 67; Opp'n Ex. 41, ECF 78-41, at 2.

In the end, the grievance process resolved in Plaintiff's favor at the third step because the supervisors failed to provide him the disciplinary memo, have him sign the memo, and investigate the matter. MSJ at 13; MSJ Ex. 14 at 20-28. Commenting on the merits yet again, the decision noted the presence of "sufficient grounds to discipline [Plaintiff] for his negligence and failure to meet performance standards[.]" MSJ Ex. 14 at 27. Defendants assert that they reimbursed Plaintiff on January 27, 2023. MSJ at 14.

### J. Plaintiff receives a third written reprimand, complains, and is then suspended for a day.

On September 9, 2022, Plaintiff received a third written reprimand from Devkota, this time for violating Rules 40(E) & (L). MSJ Ex. 13 at 15-16. Rule 40(E) requires a certain level of professionalism and courtesy of employees in interacting with the public, clients, and fellow City employees. MSJ Ex. 13 at 15. Covering similar ground, Rule 40(L) requires employees to "conduct themselves at all times in a manner becoming of a City employee" and not invite "scandal, expense or annoyance upon the

24

City" through unlawful, unethical, or otherwise improper behavior. *Id.* This notice cited findings that Plaintiff retaliated against Proctor for taking approved leave. MSJ Ex. 13 at 15.

In October 2022, Plaintiff accused Devkota of bullying by asking questions related to Plaintiff's schedule and work. Opp'n Ex. 45, ECF 72-45, at 2-4, 47. These questions included the hours Plaintiff reported to and left the office, any jobs sites Plaintiff visited, and who Plaintiff interacted with in the office or at any job sites. MSJ Ex. 9 at 56. Devkota insisted on such information because Plaintiff indicated he would be "hotelworking" on October 17 yet also revealed that he was "going to a job site." *Id.* In response to Plaintiff's complaint, Fontanez explained that Devkota inquired about Plaintiff's whereabouts only after Fontanez went to the TEC Division to give Plaintiff a check; asked Devkota where Plaintiff was; and, despite Plaintiff telling Devkota he would be in the office, was unable to find Plaintiff. *Id.* at 46. Fontanez further expressed that inquiring about an employee's whereabouts was not, in general, harassment, especially when the employee had not been seen that morning. As a result, Fontanez directed Plaintiff to answer Devkota's questions. *Id.* at 46-47.

Instead of doing so, Plaintiff contacted Sharkey and requested that (1) Devkota be prohibited from interacting with Plaintiff until the issue resolved and (2) Fontanez be recused from this situation due to his personal involvement. *Id.* at 46. Plaintiff reiterated his view that Devkota engaged in "clear harassment, bullying, intimidation, discrimination[,] and retaliation" for seeking Plaintiff's answers to those questions. *Id.* Ultimately, the parties disagreed as to whether Plaintiff responded adequately to Devkota. *Id.* at 52-54.

25

On November 15, 2022, Devkota notified Plaintiff of a one-day suspension in the form of a vacation leave reduction for violating Rules 40(A) & 56(2)(b).  MSJ Ex. 13 at 17-18.  The suspension notice related to Plaintiff's refusal to timely and adequately answer the questions about his whereabouts.  MSJ Ex. 13 at 17-18.  The notice characterized Plaintiff's "refusal to answer simple questions on [his] whereabouts" as "incredibly concerning[.]" *Id.* at 18.  Plaintiff filed a grievance regarding this suspension.  *See* MSJ Ex. 14 at 29-31.  The grievance prevailed because Defendants failed to adequately advise Plaintiff of the rules he allegedly violated.  MSJ at 14-15; *see* MSJ Ex. 14 at 29-31.  The grievance decision did not address the merits.  MSJ Ex. 14 at 31.  Defendants claim that Woolford attempted to reimburse Plaintiff for this suspension.  MSJ at 15.

Also in November, Plaintiff contacted the Office of the Inspector General ("OIG"), to request protection and accuse Devkota of retaliating in response to Plaintiff testifying about fiscal mismanagement related to a project.  MSJ Ex. 9 at 58-59.  OIG sought further details and clarification; instead of elaborating further, Plaintiff focused on his request for protection from Devkota.  *Id.*  In early December 2022, Plaintiff emailed two DOT employees and requested Fontanez's recusal from all "business dealings with" him. *See* Opp'n Ex. 47, ECF 78-47, at 2-3.

### K. Plaintiff files a second EEOC charge and further complains about retaliation and harassment.

Plaintiff filed a second Charge of Discrimination with the EEOC on December 4, 2022, alleging retaliation and discrimination based on color, race, and religion. MSJ at 26; MSJ Ex. 20 at 7. The charge contested the fifteen-day suspension, September 9 reprimand, and one-day suspension. MSJ at 27 n.29; MSJ Ex. 20 at 9-11. The EEOC issued a Notice of Right to Sue on July 7, 2023. *See* MSJ Ex. 20 at 20-24. On December 9 and 21, Plaintiff forwarded complaints to Laetitia Gardener (a DOT employee) and Keina Overton (the Equal Employment Opportunity / Civil Rights Division manager) alleging that Devkota and Fontanez violated the grievance policy and requesting his transfer, Fontanez's recusal, and the agency's rescission of all disciplinary actions. MSJ Ex. 9 at 61; Opp'n Ex. 49, ECF 78-49, at 2-6, 13; Opp'n Ex. 51, ECF 78-51, at 2-4; Opp'n Ex. 52, ECF 78-52, at 2-5. Gardener advised that she lacked authority to grant these requests and suggested that he pursue the matter with human resources or the EEOC. Opp'n Ex. 52 at 2, 4.

In January 2023, Plaintiff and DOT personnel attempted to address disputes regarding delays in reimbursing Plaintiff's overturned suspensions. MSJ Ex. 10, ECF 72-13, at 26-28. At one point, Woolford acknowledged some delays in reimbursing the full amounts for the five- and fifteen-day suspensions but noted that the five-day suspension had been reimbursed in part. Plaintiff believed DOT owed him for all five days of the shorter suspension. *Id*. at 26-27. Upon his own review, Fontanez disagreed with Plaintiff's belief and agreed with Woolford. *Id*. at 12, 22, 25. Despite conversations with Fontanez, Johnson, and Woolford, Plaintiff continued to dispute DOT's calculation. *Id*. at 11.

Almost two weeks later, Plaintiff initiated a grievance, having emailed Devokta and insisting that the City still owed him overtime, hazard, and back pay. MSJ Ex. 10 at 24; Opp'n Ex. 54, ECF 78-54, at 2. On January 23 and 30, not having received a response, Plaintiff made a formal request to move his grievance to steps two and three. MSJ Ex. 10 at 23. In between those requests, Plaintiff complained on January 26 to DOT personnel that Devkota's refusal to respond constituted retaliation and sought intervention. MSJ Ex. 10 at 18; Opp'n Ex. 55 at 2. He also maintained that DOT owed him pay for the overturned five-day suspension and for the eight days he spent preparing for and attending August 2022 grievance hearings. MSJ Ex. 10 at 19; Opp'n Ex. 56 at 2. In a February 1 response to his request to advance the grievance process, Labor Commissioner Moore-Carter explained that pay requests cannot be addressed through the grievance process and instead must be referred to HR. MSJ Ex. 10 at 22-23.

Early 2023 involved another dispute regarding performance reviews—this time of employees reporting to Plaintiff. In January, Plaintiff received a reminder to submit his mid-year performance reviews for his subordinates by February 3. MSJ Ex. 10 at 51. On January 24 and 30, Plaintiff asked Devkota to have Gabriel complete the reviews because since Fontanez informed Plaintiff about an imminent transfer. *Id.* at 50. Devkota denied the request, explaining that notwithstanding any issues between Plaintiff and his subordinates, the evaluations required input of the subject employee's supervisor—in these cases, Plaintiff. *Id.* at 49. On February 1, Plaintiff claimed lack of awareness about mid-year performance reviews as well as his confusion about why Gabriel could not provide CPS-I evaluations despite having done so previously. MSJ Ex. 10 at 49; Opp'n Ex. 57, ECF 78-57, at 2. The record before the Court reflects that in preceding years, Plaintiff received similar reminders about submitting mid-year

evaluations.  *See* MSJ Ex. 10 at 45-47.  Nonetheless, Plaintiff maintained that Devkota's directive to complete evaluations was an act of retaliation.  MSJ Ex. 10 at 49; Opp'n Ex. 57 at 2.

The next day, Devkota directed Plaintiff to cancel his mid-year evaluation meetings with subordinates Proctor and Suggs because Plaintiff failed to follow Devkota's directions.  *Ibid.*  Devkota then scheduled a February 9 meeting with Gabriel, Fontanez, and Plaintiff to discuss his actions.  *Id.*  Relevant to the next section, Devkota planned the meeting for 10:00 a.m. on the seventh floor of the Benton Building in downtown Baltimore.[14]  *Id.*  Plaintiff insisted that the evaluation cancellations constituted harassment and retaliation.  MSJ Ex. 10 at 48-49; Opp'n Ex. 58, ECF 78-58, at 2.  Plaintiff submitted transfer and leave requests, but DOT personnel instructed him to follow Devkota's instructions.  MSJ Ex. 10 at 48; Opp'n Ex. 58 at 2.

### L.  Plaintiff accuses Devkota of initiating a security response to Plaintiff's presence and continues efforts to transfer.

Leading up to the February 9 meeting, Plaintiff sought and received approval for a security officer to be present at the meeting "to maintain order and professional conduct amongst the meeting participants."  MSJ Ex. 10 at 56.  That morning, according to Plaintiff, Devkota called the police on him, his son, and his son's wife because they "are Afro-American and dressed in Islamic/Muslim attire."  MSJ Ex. 10 at 60-61; Opp'n Ex. 59, ECF 78-59, at 3.  Plaintiff alleged that an armed security guard told him that Devkota "came to the armed guard station complaining of unauthorized personnel of the 7th floor speaking as '. . . their are Terrorist on the 7th floor.' [sic]  The armed guard

---

[14] The Benton Building houses several City and other government agencies.

stated that Mr. Devkota looked afraid and scared at the time of his complaint." MSJ Ex. 10 at 61. Plaintiff accused Devkota of pointing directly at Plaintiff's son upon the guards' arrival, as if urging the guards to react to his son, despite Devkota's knowledge of the in-person meeting. *Id.* Plaintiff relayed this complaint to personnel at DOT, OIG, and the mayor's office, as well as the Baltimore Police Department. MSJ Ex. 10 at 60-61; Opp'n Ex. 59 at 3; Opp'n Ex. 62, ECF 78-62, at 2.

An incident report prepared by Benton Building security also discussed the incident. MSJ Ex. 17, ECF 72-20, at 3. The report noted, among other things, that two "DCHD[15] management employees" alerted an armed officer of unauthorized individuals on the floor; upon arriving on the seventh floor, the officer located the individuals and determined them to be Plaintiff, his son, and a "female representative"; and that the officer understood all three to be authorized. *Id.* The report also indicated that security personnel discussed the matter with "a senior member of DCHD management"; returned to the seventh floor to notify Plaintiff that all three were authorized to be present; and served as security for the meeting between Plaintiff and his supervisors. *Id.*

Following this incident, Plaintiff requested that future meetings with Devkota in late February be held by videoconference to avoid any security issues. MSJ Ex. 10 at 68. DOT personnel denied the request because Plaintiff was scheduled to be in the office and building security provided a safe environment. *Id.* DOT cancelled those meetings

---

[15] The report does not define this acronym. It may reflect a typographical error in referring to Baltimore City's Department of Housing & Community Development, which is in the Benton Building. *See* Department of Housing & Community Development, https://www.baltimorecity.gov/dhcd [*https://perma.cc/7MAV-TS87*] (last visited March 31, 2026) (noting address as 417 Fayette Street, 14th floor, Baltimore, MD).

after Plaintiff provided notice of a February 22, 2023 interim peace order issued against Devkota.[16]  *Id.* at 67; Opp'n Ex. 63, ECF 78-63, at 2.

On August 8, 2023, DOT issued investigatory findings regarding the February 9 incident.  *See* Opp'n Ex. 77, ECF 78-77, at 2-11.  DOT recommended Plaintiff's reassignment to another immediate and second-line supervisor; that Plaintiff, as well as Devkota and Gabriel, complete certain trainings; any discipline imposed against Plaintiff occur after management's consultation with human resources; and that DGS human resources investigate the release of security camera footage.  *Id.* at 11.  Plaintiff claims that the investigation constituted harassment and retaliation.  *See* TAC at ¶ 91.

### M. Additional disputes regarding Plaintiff's leave requests.

Leave disputes surfaced during the summer of 2023.  On or about May 20, Plaintiff sought permission leave May 22 through June 3 due to a "workplace violence incident."  Opp'n Ex. 69, ECF 78-69, at 2.  Gabriel approved the request on May 22.  MSJ Ex. 10 at 78; Opp'n Ex. 70, ECF 78-70, at 2.  On June 5, Gabriel advised this approval was an error because only the Labor Commissioner could approve permission leave, according to Fontanez and Gardener.  MSJ Ex. 10 at 83; Opp'n Ex. 71, ECF 78-71, at 3; Opp'n Ex. 73, ECF 78-73, at 2.  Gabriel recommended that Plaintiff use personal leave.  MSJ Ex. 10 at 83; Opp'n Ex. 71 at 3.

---

[16] The interim peace order converted into a temporary one on February 24.  Opp'n Ex. 63 at 2.  But, on March 6 and April 19, the issuing court denied Plaintiff's application for a permanent peace order.  MSJ at 19.  Plaintiff attended the peace order hearings on those dates.  Gabriel asked Plaintiff to correct his time entries for March 6 and submit a leave request for February 24.  Plaintiff complained that this request constituted harassment.  *See* Opp'n Ex. 68, ECF 78-68, at 2.

On June 20, Plaintiff submitted a leave request and emailed DOT personnel as well as the City Law Department, seeking their approval in lieu of risking additional clashes with Devkota.  MSJ Ex. 10 at 84.  DOT's response reiterated that only the Office of the Labor Commissioner could grant permission leave.  MSJ Ex. 10 at 88.  Plaintiff asked for specification of this policy but never received an answer.  Opp'n Ex. 78, ECF 78-78, at 5, 10-11.  Less than a week later, Plaintiff emailed Devkota, other DOT personnel, and the City Law Department, inquiring why every other employee received timely responses to leave requests.  MSJ Ex. 10 at 89-91; Opp'n Ex. 74, ECF 78-74, at 2-5.  On June 27, Woolford explained that Plaintiff "inadvertently used unauthorized permission leave for extended period" and must correct the request or DOT would do so because only the Office of the Labor Commissioner could approve such leave.  MSJ Ex. 10 at 104.  Two days later, she informed Plaintiff that these permission leave requests were denied and asked Plaintiff to submit a new, proper leave request in place of the one his supervisor mistakenly approved.  *Id.* at 101-03.

On July 7, 2023, Plaintiff accused Devkota of improperly approving alterations of leave requests previously approved.  MSJ Ex. 10 at 106; Opp'n Ex. 78, ECF 78-78, at 4-5.  He disagreed with Woolford's justification for changing the leave requests.  *See* MSJ Ex. 10 at 106; Opp'n Ex. 78 at 4-5.  On July 20, Plaintiff accused Fontanez of providing false testimony, suppressing evidence, initiating fraud, and enforcing unnecessary disciplinary actions.  MSJ Ex. 10 at 113.  Refusing his request that she forward it to OIG, Gardener directed Plaintiff to file his complaint with OIG directly.  *Id.* at 110-12.

On August 24, Plaintiff again accused Devkota and Fontanez of fraudulently altering the leave system.  Opp'n Ex. 78 at 4.  As a result, he claimed a loss of twenty-one days of leave and an improper suspension.  *Id.*  The next week, he accused Overton—

32

DOT's Equal Employment Opportunity and Civil Rights Division manager—of recording his EEOC complaint incorrectly. *Id.* at 2.

## II.　PROCEDURAL BACKGROUND

The procedural history is less convoluted than the factual one. Plaintiff sued the City and DOT, asserting retaliation in violation of federal law as well as negligence, negligent supervision, and respondeat superior. *See* Compl., ECF 1, at ¶¶ 49-70. An amended complaint named Devkota as a defendant in place of DOT. *See* ECF 18. After Judge Gesner granted Defendants' motion for a more definite statement, Plaintiff filed a Second Amended Complaint clarifying the capacity in which he sued Devkota. *See* ECF 30, at 5-6; ECF 32. Judge Gesner denied Defendants' motion to dismiss the negligence and negligent supervision claims based on failure to provide proper notice. ECF 30, at 6-8. In February 2024,[17] Judge Abelson granted Defendants' motion to dismiss the respondeat superior claim but denied as to the retaliation claims. ECF 37, at 5-9.

In August 2024, Plaintiff amended his complaint for a third and final time . ECF 60. Fourteen counts are now pending:

Count I:　42 U.S.C. § 1981 retaliation against the City and Devkota

Count II:　§ 1981 retaliation against all Defendants

Count III:　Title VII of the Civil Rights Act of 1964 retaliation against the City and Devkota

Count IV:　Title VII retaliation against all Defendants

Count V:　Title VII religious discrimination against all Defendants

---

[17] Months before, Plaintiff initiated a separate action in this Court against the Defendants. *See Abdus-Shahid v. Mayor and City Council of Baltimore City*, No. 23-cv-2705 (D. Md. filed Oct. 5, 2023). The Court consolidated that case with this one in July 2024. ECF 51.

Count VI:     Title VII hostile work environment against all Defendants

Count VII:    Negligence against all Defendants

Count VIII:   Negligent supervision against all Defendants

Count IX:     Unjust enrichment against all Defendants

Count X:      Fair Labor Standards Act ("FLSA") unpaid overtime pay
              against all Defendants

Count XI:     Tortious interference with prospective advantage against all
              Defendants

Count XII:    Maryland Wage Payment & Collection Law ("MWPCL")
              unpaid back, hazard, and out-of-title pay against Defendants

Count XIII:   Civil conspiracy against the City and Devkota

Count XIV:    Defamation against the City and Devkota

TAC, at ¶¶ 94-167.  Defendants moved for summary judgment on January 31, 2025.

ECFs 72.  Plaintiff opposed, and Defendants filed a reply.  ECFs 78, 81.

## III.    STANDARD OF REVIEW

Federal Rule of Civil Procedure ("FRCP") 56(a) provides that a court shall grant

summary judgment where "the movant shows that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law."  "A dispute is

genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian*

*Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging*

*Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)).  "A fact is material if it 'might affect the

outcome of the suit under the governing law.'" *Id.* (quoting *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 248 (1986)).  Accordingly, "the mere existence of *some* alleged factual

dispute between the parties will not defeat an otherwise properly supported motion for

summary judgment[.]"  *Anderson*, 477 U.S. at 247–48 (emphasis in original).  Put

another way, summary judgment is appropriate where the evidence "is so one-sided that

one party must prevail as a matter of law." *Id.* at 252.  When considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to a jury for resolution at trial.  *Id.* at 249.  In undertaking this inquiry, the court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Judd*, 718 F.3d at 312; *see also Scott v. Harris*, 550 U.S. 372, 378 (2007).

When a party has submitted sufficient evidence to support its request for summary judgment, the burden shifts to the nonmoving party to show that there are genuine issues of material facts.  *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008).  However, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

In considering a summary judgment motion, the court does not make credibility determinations.  *Wilson v. Prince George's Cnty.*, 893 F.3d 213, 218-19 (4th Cir. 2018). The role of the court is not "to weigh the evidence and determine the truth of the matter" but rather "to determine whether there is a genuine issue for trial."  *Anderson*, 477 U.S. at 249.  Therefore, in the face of conflicting evidence, such as competing affidavits or other testimony, summary judgment ordinarily is not appropriate; the factfinder must resolve factual disputes, including matters of witness credibility.  *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002).  That said, "a party's self-serving opinion . . . cannot, absent objective corroboration, defeat summary judgment."  *CTB, Inc. v. Hog Slat, Inc.*, 954 F.3d 647, 658-59 (4th Cir. 2020)*; see also Felty*, 818 F.2d at 1128 ("Unsupported speculation is not sufficient to defeat a summary judgment motion.").

35

## IV.    ANALYSIS

The Court is mindful that it does not "sit as a kind of super-personnel department weighing the prudence of employment decisions." *Vannoy v. Fed. Reserve Bank of Richmond*, 827 F3d 296, 305 (4th Cir. 2016).  Instead, it applies the governing law to the facts to determine not the mere existence of interpersonal issues, stressors, or conflict in a workplace but the existence of the sort of discriminatory and retaliatory action that rises to an actionable level.  As explained below, the Court grants the Motion for Summary Judgment on all counts.  Regarding his retaliation claims, Plaintiff fails to genuinely dispute whether Defendants' reasons for the disciplinary actions are pretextual.  As to his discrimination claim, Plaintiff fails to establish differential treatment.  Likewise, Plaintiff does not offer sufficient evidence supporting triable issues on his hostile work environment, tort-based, and unpaid wages claims.  Acknowledging that myriad factual disputes exist as to each count, the Court finds such disputes are not material or are based on evidence that cannot create a jury issue.

### A. The Court grants summary judgment on the Title VII and § 1981 claims (Counts I-V).

The central thrust of this lawsuit is Plaintiff's contention that between October 2020 and July 2023, Defendants subjected him to retaliation, religious discrimination, and a hostile work environment.  A party may assert claims for retaliation, religious discrimination, and hostile work environment under Title VII of the Civil Rights Act of 1964 or 42 U.S.C. § 1981.  *See CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 454-55 (2008) (recognizing that a plaintiff may assert a retaliation claim under Title VII and § 1981); *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 184 (4th Cir. 2001) (recognizing that a hostile work environment claim is available under Title VII and § 1981); *E.E.O.C.*

36

*v. Ithaca Indus., Inc.*, 849 F.2d 116, 118 (4th Cir. 1988) ("[Title VII] makes it an unlawful employment practice for an employer to discriminate against an employee on the basis of his or her religion.").

            i.     *Certain allegations are time-barred and cannot be considered.*

As a preliminary matter, Defendants argue that several of the allegations in the Complaint fall beyond the limits of permissible Title VII and § 1981 claims in this case. Defendants pursue two different theories to rid of certain allegations. First is that the Court cannot consider any allegations that occurred before August 12, 2021, which marks 300 days before Plaintiff filed his EEOC charges. MSJ at 31. This includes allegations related to the February and March 2021 written reprimands and to Plaintiff's out-of-title pay and transfer requests. *See id.* at 26; MSJ Ex. 20 at 2.

Defendants are correct that "a discriminatory charge must be filed with the EEOC within 300 days of the date the alleged unlawful employment practice occurred." *Ferguson v. Balt. Police Dep't*, No. BPG-21-2502, 2022 WL 3447273, at *5 (D. Md. Aug. 16, 2022). "Timeliness requirements for an action alleging employment discrimination are to be strictly enforced." *Tangires v. Johns Hopkins Hosp.*, 79 F. Supp. 2d 587, 597 (D. Md. 2000). In general, this strict enforcement bars consideration of discriminatory acts "outside the statutory window." *Id.* Allegations falling beyond the 300-day period will be considered only where they are "discrete acts of discrimination or retaliation," *Landa v. Univ. of Md., Coll. Park*, No. TJS-22-0016, 2022 WL 2905094, at *5 (D. Md. July 22, 2022), or "related to a timely incident as a series of separate but related acts," *Tangires*, 79 F. Supp. 2d at 597.

The Court will consider allegations related to the February and March 2021 written reprimands. Plaintiff's first EEOC charge contends that due to his race, Gabriel,

beginning in February 2021, harassed and bullied Plaintiff by taking four disciplinary actions, including two five-day suspensions.  Issued on September 28, 2021, the two suspensions fall within the 300-day window.  *See* MSJ Ex. 13 at 8-11.  Because the charge alleges a pattern of harassment and bullying through continuous disciplinary action, the Court views the earlier reprimands "as a series of separate but related acts." *Tangires*, 79 F. Supp. 2d at 597.

However, the same cannot be said about the out-of-title pay and transfer requests.  As an initial matter, Plaintiff does not allege that the denied requests constitute disciplinary actions, and the Court aware of authority that considers such actions "disciplinary" in nature.  Therefore, unlike the reprimands, the Court does not view the denied requests as a series of separate but related acts to the timely incidents (the two five-day suspensions).  Moreover, the suspensions punished Plaintiff for failing to communicate with an external contractor and provide time-sensitive information.  MSJ Ex. 13 at 8-11.  No evidence connects the denied pay requests to the reasons offered for the suspensions.  Accordingly, the Court will not consider allegations related to the out-of-title pay and transfer requests.

Defendants' second timeliness attack is that the Court cannot consider any allegations not reasonably related to the claims stated in Plaintiff's EEOC charges.  MSJ at 31.  In Defendants' view, this bar extends to annual performance reviews, the 2023 security incident involving the alleged filing of a "police report," and pay and leave requests.  Defendants are correct that "allegations contained in the administrative charge of discrimination generally operate to limit the scope of any subsequent judicial complaint." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962-63 (4th Cir. 1996).  But this is not absolute.  "Although the charge defines the scope of the right to

38

file a subsequent civil suit, the initial administrative complaint does not create strict, impenetrable limits on those subsequent rights." *Thorn v. Sebelius*, 766 F. Supp. 2d 585, 596 (D. Md. 2011). Instead, a subsequent civil action is limited to "those discrimination claims stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint." *Evans*, 80 F.3d at 963 (citations omitted). In contrast, failure to exhaust administrative remedies arises where the "'administrative charges reference different time frames, actors, and discriminatory conduct than the central factual allegations in his formal suit.'" *Thorn*, 766 F. Supp. 2d at 596 (quoting *Chacko v. Patuxent Inst.*, 429 F.2d 505, 506 (4th Cir. 2005)).

The Court will consider allegations related to the February 9, 2023 security incident, the overtime pay request, and Plaintiff's annual performance reviews. Plaintiff's second EEOC charge alleges that due to his religion, Devkota, as early as June 2022, subjected him to continuous harassment, bullying, and retaliation. MSJ Ex. 20 at 9-11. Viewing the facts and all reasonable inferences in the light most favorable to Plaintiff, the Court finds the February 9, 2023 security incident reasonably related to the second EEOC charge and capable of being developed by reasonable investigation of that charge. The complaint's allegations of "continuous" harassment, bullying, and retaliation make Devkota's conduct—including allegedly contacting the police or on-site security to harass or otherwise endanger Plaintiff—relevant. Similar logic applies to performance reviews and the April 2022 overtime pay request. The record reflects Gabriel's responsibility for completing performance evaluations and approving overtime pay. Because the first EEOC charge accused him of harassment and bullying, Gabriel's conduct is relevant. Such conduct could include refusing to review or approve an

39

overtime request where the employee alleges that intentional harassment and retaliation motivated those refusals.

However, the Court will not consider allegations related to permission leave requests. The evidence before the Court reflects that the Office of the Labor Commissioner or other DOT human resources personnel held responsibility for such requests. Therefore, the allegations related to permission leave requests are not reasonably related to Devkota's or Gabriel's conduct. *See Thorn*, 766 F. Supp. 2d at 596 (declining to find reasonably related any allegations that implicated employees who were not the named defendants). As a result, the Court must determine whether these allegations are reasonably related to other claims in Plaintiff's EEOC charges. The short answer is no because neither charge references the denial of a permission leave request. Therefore, allegations related to these requests are neither reasonably related to the charges nor could be developed by reasonable investigation.

> ii. *Plaintiff does not present evidence of intentional discrimination sufficient to create a triable issue.*

"'The ultimate question in every employment discrimination case . . . is whether the plaintiff was the victim of intentional discrimination.'" *Grant v. Balt. City Police Dep't*, No. RDB-21-2173, 2024 WL 382631, at *4 (D. Md. Feb. 1, 2024) (quoting *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 286 (4th Cir. 2004) (internal quotation marks and brackets omitted) (ellipsis in original)). A plaintiff's first route for avoiding adverse summary judgment to "present sufficient direct or circumstantial evidence showing that an adverse employment action was motivated by intentional discrimination aimed at the plaintiff's protected characteristic(s)." *Guessous v.*

*Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). (The second route appears in the next section.)

As explained below, Plaintiff lacks sufficient direct or circumstantial evidence of intentional discrimination. As a general guidepost, the Court observes that a plaintiff "must produce evidence that clearly indicates a discriminatory attitude at the workplace and must illustrate a nexus between that negative attitude and the employment action." *Rayyan v. Va. Dep't of Transp.*, 719 F. App'x 198, 202 (4th Cir. 2018) (internal quotation marks and citation omitted). Plaintiff cites three incidents that he believes constitute evidence of intentional discrimination: race-related statements, bias, and affirmative acts.

The race-related statements do not demonstrate intentional discrimination. First, Plaintiff alleges that Devkota said that his "brother died during Covid-19 in India, and that the Hindus blamed the Muslims for the Covid related deaths of Hindus, as the Muslims utilized the majority of the Personal Protective Equipment [] during the pandemic." TAC at ¶ 116. Allegations in an unverified complaint do not move the needle at summary judgment. *See* Fed. R. Civ. P. 56(c); *Vorleamesi v. Esper*, No. PWG-20-442, 2021 WL 3681163, at *4 (D. Md. Aug. 19, 2021) (citing *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991)).

Second, Plaintiff refers to Devkota's statement, following a denial of out-of-title pay, referencing Plaintiff's status as the "highest paid black CPS-II[.]'" Opp'n Ex. 10 at ¶ 1. The statement is susceptible to a troubling inference. But within the contours of intentional discrimination jurisprudence, it does not provide an unmistakable nexus between discriminatory intent and the alleged adverse action. *See Rayyan v. Va. Dep't of Transp.*, 719 F. App'x 198, 202 (4th Cir. 2018) (finding that an employee "must

41

produce evidence that clearly indicates a discriminatory attitude at the workplace and must illustrate a nexus between that negative attitude and the employment action" (internal quotation marks and citation omitted)).  Plaintiff's argument is, in essence, that Defendants denied the out-of-title pay request in part due to awareness that the highest paid CPS-II was a Black employee.  To agree, the Court would have to infer that such awareness—not any other consideration present in the record such as DOT's interpretation of Plaintiff's job duties—bore directly on Defendants' decision to deny the request.  That is incompatible with the law regarding direct evidence of *intentional* discrimination (although it could be relevant to the *McDonnell Douglas* approach discussed below).  *See Walton v. Harker*, 33 F.4th 165, 176-77 (4th Cir. 2022) ("Direct evidence 'is evidence which, if believed, would prove the existence of a fact without any inference or presumptions.'" (quoting *O'Connor v. Consol. Coin Caterers Corp.*, 56 F.3d 542, 548 (4th Cir. 1995)).  Instead, there being no other alleged instances of similar comments in connection with out-of-title pay requests or other compensation decisions, this appears to be the sort of unwarranted yet "stray remark" that does not provide evidence of intentional discrimination.  *Rayyan*, 719 F. App'x at 202.

Third, Plaintiff cites Devkota's statements related to Lewis' reassignment.  If true, the Court would disapprove of Devkota saying, "she's white your [sic] black you can't win" to Plaintiff.  Opp'n Ex. 10 at ¶ 2.  Yet this statement does not bear "directly on the contested employment decision." *Walton*, 33 F.4th at 176-77.  Instead, it concerned the incident involving Lewis and her reassignment to Gabriel after the City reached a settlement agreement to resolve her complaint involving Plaintiff's conduct.  *See* MSJ Ex. 19 at 2-3, 7-22.  Plaintiff does not contend that reassigning Lewis to another

42

supervisor was an employment action adverse to Plaintiff.  Devkota's statement lacks a nexus with the adverse actions Plaintiff claims.

No more helpful is Plaintiff's contention that Devkota harbored a general bias against Black and Muslim individuals.  Opp'n Ex. 9 at ¶ 1.  Plaintiff does not connect the specific adverse actions with any evidence that would support the contention that Devkota originates from a society with a racially discriminatory hierarchy or is aware of tension between Hindus and Muslims *and* took any specific adverse actions because of this cultural background.  While there may be unfortunate realities of religious or racial hierarchies in a society, the law demands more than general or broad statements untethered to specific adverse actions.  *Cf. E.E.O.C. v. Clay Printing Co.*, 955 F.2d 936, 942 (4th Cir. 1992).

Aside from the alleged statements, Plaintiff emphasizes two actions by Devkota, neither of which evidence intentional discrimination.  First, Plaintiff claims that Devkota directed McDonald to tell Plaintiff not to pray on City property or time.  Opp'n Ex. 10 at ¶ 3.  But there is no objective corroboration of this statement or other reason to consider this more than inadmissible hearsay,[18] which cannot be considered at summary judgment.  *See Lyons v. City of Alexandria*, 35 F.4th 285, 290 n.5 (4th Cir. 2022).  To the extent Plaintiff merely believes this directive occurred, the Court notes that a "self-serving opinion . . . cannot, absent objective corroboration, defeat summary judgment."

---

[18] In general, Devkota's statements may be non-hearsay and admissible against him or his employer as a statement of a party opponent.  Fed. R. Evid. 801(d)(2).  But Plaintiff does not indicate that he witnessed the alleged direction firsthand.  Thus, there is an additional level of hearsay that Plaintiff would have to overcome.  Offering no indication he can do so, the Court concludes that this alleged directive—unlike the statements alleged to be made directly to Plaintiff—falls outside of Rule 801(d)(2).

*CTB, Inc. v. Hog Slat, Inc.*, 954 F.3d 647, 658-59 (4th Cir. 2020) (internal quotation marks and citation omitted) (ellipsis in original).  Objective corroboration would include independent support for the facts asserted or a witness confirming Devkota's actions.  Neither appears in the record.  In addition, the interaction—for which Devkota acknowledged McDonald received counseling—occurred in 2013 or 2014, approximately seven years before the 300-day actionable window established by the EEOC charges.  Second, to the extent Plaintiff relies on the 2021 refusal to reassign McDonald to a project not involving Plaintiff, the Court does not find this "denial" (as to an employee not within Devkota's control) constitutes an adverse action.  *Infra* Section IV.A.iii.a.

### iii.    *Plaintiff fails to provide sufficient evidence on the Title VII and Section 1981 retaliation claims (Counts I–IV).*

"Title VII and Section 1981 prohibit an employer from retaliating against an employee for opposing unlawful discrimination or participating in Title VII processes." *Johnson v. Portfolio Recovery Assocs., LLC*, 682 F. Supp. 2d 560, 568 (E.D. Va. 2009).  Where a plaintiff alleges retaliation under both statutes, courts review the claims together because the elements are identical.  *Guessous*, 828 F.3d at 217; *see also Honor v. Booz-Allen & Hamilton, Inc.*, 383 F.3d 180, 188 (4th Cir. 2004) (recognizing that the elements of *prima facie* Title VII and § 1981 retaliation claims are identical).  As noted above, there are two methods.  The first, evidence of intentional discrimination, has been addressed.  Absent direct or circumstantial evidence of intentional discrimination, a plaintiff avoids summary judgment if he can satisfy the *McDonnell Douglas* burden-shifting framework.  *Guessous*, 828 F.3d at 216; *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Through this method, a plaintiff establishes that the

44

employer's reason for the adverse action was a pretext for discrimination or retaliation as follows:

> (1) the plaintiff must first establish a prima facie case of employment discrimination or retaliation; (2) the burden of production then shifts to the employer to articulate a non-discriminatory or non-retaliatory reason for the adverse action; (3) the burden then shifts back to the plaintiff to prove by a preponderance of the evidence that the stated reason for the adverse employment action is a pretext and that the true reason is discriminatory or retaliatory.

*Guessous*, 828 F.3d at 216.

"To establish a prima facie case of retaliation under either statute, [Plaintiff] must show '(i) that [he] engaged in protected activity; (ii) that [his employer] took adverse action against [him]; and (iii) that a causal relationship existed between the protected activity and the adverse employment activity. *Id.* (quoting *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 250 (4th Cir. 2015)). "For purposes of a retaliation claim, a materially adverse action is one that 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Rorie v. Bd. of Educ. of Charles Cnty.*, 653 F. Supp. 3d 217, 238 (D. Md. 2023) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).

Defendants concede that Plaintiff satisfies the first and second *prima facie* elements. MSJ at 33. They focus on the existence of a causal relationship between Plaintiff's protected activities and any adverse actions. Defendants also insist that even if a *prima facie* case exists, Plaintiff cannot show that Defendants' legitimate, non-discriminatory reasons are pretextual. *Id.* at 33-36. The Court agrees that, in the end, Plaintiff lacks evidence that can satisfy *McDonnell Douglas*.

        a. <u>While there is evidence satisfying the first two *prima facie* elements, not all alleged adverse conduct is actionable.</u>

45

In the interest of completeness, the Court addresses the evidence satisfying the first two *prima facie* elements. The first one is easy, as there can be no serious dispute that filing EEOC charges qualifies as protected activities. *See Rorie*, 653 F. Supp. 3d at 238. So do the swath of internal complaints Plaintiff lodged between February 2021 and June 2023. *See Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 122 (4th Cir. 2021) ("Complaints raised through internal company procedures are recognized as protected activity."); *Strothers v. City of Laurel, Md.*, 895 F.3d 317, 328 (4th Cir. 2018) (complaint to supervisors about suspected Title VII violations). The Court notes that the grievance process, which Plaintiff regularly pursued, offers a structure similar enough to what the Fourth Circuit characterized as "certainly" constituting protected activity. *See Roberts*, 998 F.3d at 122 (noting that the plaintiff complained to a supervisor, then another supervisor, and then to the defendant's human resources manager).

The second prong, while undisputed in general, warrants some exploration. There can be no serious dispute that suspensions are adverse actions. *See Muldrow v. City of St. Louis*, 601 U.S. 346, 354 (2024) (holding that to qualify as an adverse action, the action must bring "about some 'disadvantageous' change in an employment term or condition" (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998))). This is true even where a suspension is later rescinded and the employee receives back pay. *See Burlington*, 548 U.S. at 71-73(affirming jury verdict that suspension constituted adverse action notwithstanding later rescission and reimbursement of back pay); *U.S. E.E.O.C. v. Rite Aid Corp.*, 750 F. Supp. 2d 564, 571 (D. Md. 2010) (indefinite suspension); *Sturdivant v. Kone Inc.*, No. 09-224-RJC-DCK, 2010 WL 2723729, at *9 n.4 (W.D.N.C. July 8, 2010) (concluding that a "suspension

46

without pay, followed by later reinstatement with back pay," constitutes an adverse employment action).

The reprimands also qualify as adverse actions.  Although "[t]he scope of Title VII's anti-retaliation provision . . . is broader than the anti-discrimination provision", *Strothers*, 895 F.3d at 327, "there must be some direct or indirect impact on an individual's employment", *Rodgers v. Eagle All.*, 586 F. Supp. 3d 398, 446 (D. Md. 2022) (internal quotation marks and citation omitted).  That is, the employer's conduct must have "negatively impacted" the terms, conditions, or benefits of employment. *Magassouba v. Prince George's Cnty.*, 773 F. Supp. 3d 196, 213 (D. Md. 2025) (citing *Muldrow*, 601 U.S. at 354); *Von Gunten v. Maryland*, 243 F.3d 858, 866 (4th Cir. 2001).  Employment "terms or conditions" include "'hiring, granting leave, discharging, promoting, and compensating.'"  *Brockman v. Snow*, 217 F. App'x 201, 205 (4th Cir. 2007) (quoting *Page v. Bolger*, 645 F.2d 227, 233 (4th Cir. 1981)).  But the phrase "is not used in the narrow contractual sense; it covers more than the economic or tangible." *Muldrow*, 601 U.S. at 354 (internal quotation marks and citations omitted).  Therefore, Title VII adverse actions include those "that cause a 'decrease in compensation, job title, level of responsibility, or opportunity for promotion[.]'"  *Vedula v. Azar*, No. TDC-18-0386, 2020 WL 5500279, at *7 (quoting *Boone v. Goldin*, 178 F.3d 253, 256-57 (4th Cir. 1999)).  The employee need not show "significant detrimental effect" but only the existence of "some harm respecting an identifiable term or condition of employment." *Muldrow*, 601 U.S. at 355, 357.  This standard requires more than "employee irritation or inconvenience [that] does not affect a term, condition, or benefit of [his] employment." *Spriggs v. Pub. Serv. Comm'n of Md.*, 197 F. Supp. 2d 388, 393 (D. Md. 2002).  Viewing the facts and all reasonable inferences in the light most favorable to

47

Plaintiff, the Court finds that Plaintiff has shown *some* harm caused by the reprimands. As one example, Plaintiff is correct that the reprimands set the table for Defendants to pursue more serious and lengthier disciplinary actions. In fact, Defendants concede as much. MSJ, at 13 (citing MSJ Ex. 15).

The Court reaches a different conclusion regarding the 2023 security incident. Unaware of a decision in this Circuit addressing the issue, the Court recognizes that others have considered whether calling law enforcement on an employee constitutes an adverse employment action. Some courts look at whether the report "carr[ies] a significant risk of humiliation, damage to reputation, and a concomitant harm to future employment prospects" and whether "the matter persisted beyond the filing of the report." *Dick v. Phone Directories Co., Inc.*, 397 F.3d 1256, 1269 (10th Cir. 2005) (internal quotation marks and citation omitted) (no adverse employment action); *see also Brenyah v. Columbia Hosp. Corp. of Bay Area*, No. 21-0087, 2024 WL 5516008, at *23 (S.D. Tex. Oct. 7, 2024) (requiring the plaintiff to show that a call to police affected the "terms, conditions, or privileges of employment"); *Marcus v. West*, No. 99-0261, 2002 WL 1263999, at *9 (N.D. Ill. June 3, 2002) (declining to find as adverse a call to police where "the police did not take any action"). Other courts consider whether "the employer singled out a particular ethnic group for its report to the police" and whether "the report was false." *Aviles v. Cornell Forge Co.*, 241 F.3d 589, 593 (7th Cir. 2001). Litigants in the Eastern District of Virginia raised the issue, but the decision turned on the lack of a causal connection and absence of evidence that the call was motivated by protected activity. *Crawford v. Newport News Indus. Corp.*, No. 14-130, 2018 WL 4561671, at *80 (E.D. Va. Mar. 2, 2018). Mindful of these approaches as well as *Muldrow*'s emphasis on the effect of an action on employment, the Court finds that the

48

2023 "police report," as Plaintiff describes it, does not constitute an adverse action. And, similar to *Crawford*, Plaintiff fails to establish that his protected activity motivated Devkota to alert security. As discussed above, Plaintiff insists that Devkota took this action based on racial animus. Further, Plaintiff does not show that the incident resulted in *some* harm to his employment. Aside from Plaintiff's grievance, the resulting internal investigation, and Plaintiff requesting that certain meetings occur via videoconference rather than in person, the record does not demonstrate how "the matter persisted beyond" the incident itself. Nothing indicates how this impacted the terms and conditions of Plaintiff's employment.

Further on the issue of adverse actions, Plaintiff highlights Devkota's denial of Plaintiff's transfer and pay requests as well as the race-related statements addressed above. None qualify under *McDonnell Douglas*. First, denied transfer requests are not adverse actions unless they yield some disadvantageous change in an employment term or condition. *Aly v. Yellen*, No. AAQ-23-1699, 2024 WL 2053492, at *5 (D. Md. May 8, 2024) (citing *Charlot v. Donley*, No. 11-579-MBS, 2014 WL 1319182, at *14 (D.S.C. Mar. 31, 2014)). No evidence provided to the Court indicates that the denials "detrimentally alter[ed] the terms of" Plaintiff's employment. *Id.* In fact, the record reflects that when Plaintiff sought McDonald's reassignment or his own transfer, Devkota took efforts to ensure that McDonald did not contact Plaintiff directly. *See* MSJ Ex. 8 at 40-43; Opp'n Ex. 21 at 3-5. Although McDonald remained on the same project as Plaintiff, nothing reflects any incident between the two or McDonald's attempting to contact Plaintiff. *See ibid.* Counsel confirmed at oral argument no such contact occurred after Plaintiff voiced concerns. Second, Plaintiff's April 2022 overtime pay request is not an adverse action because Defendants ultimately compensated Plaintiff for the overtime hours despite

49

some initial resistance.  Thus, Plaintiff did not suffer harm to his employment.  Third, regarding the race-related statements alleged in the complaint, the Court finds these are not actionable on this record.  There being no attendant disciplinary or other act detrimentally altering Plaintiff's employment, Devkota's statement amounts to "nothing more than rude treatment" and "callous behavior" that, while offensive or regrettable, is not necessarily actionable under Title VII and Section 1981.  *E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315-16 (4th Cir. 2008).  While troubled by the nature of the alleged comments, the Court's findings also consider that Plaintiff offers a handful of comments attributed to an individual Plaintiff interacted with frequently while being employed by DOT for several years.  This is not to say that the longer one works for an employer or supervisor, the more they must endure before they can obtain relief in federal court.  But the Court must be mindful of what inferences may be drawn from conduct and the need to discern the difference between infrequent offensive utterances and those ongoing, "repeated invectives of an overtly racial tenor" that reflect "racial enmity."  *Laurent-Workman v. Wormuth*, 54 F.4th 201, 211-12 (4th Cir. 2022).

    b. <u>Plaintiff demonstrates a genuine dispute of material fact regarding a causal relationship exists between protected activity and adverse actions.</u>

  Defendants contend that Plaintiff cannot demonstrate a causal relationship between protected activities and actionable adverse actions.  MSJ at 33-34.  The Court disagrees.  "[E]stablishing a 'causal relationship' at the *prima facie* stage is not an onerous burden.  Purported victims of retaliation do not have to show at the *prima facie* stage that their protected activities were but-for causes of the adverse action."  *Strothers*, 895 F.3d at 335; *see also Burgess v. Bowen*, 466 F. App'x 272, 283 (4th Cir. 2012) (reiterating that "very little evidence of a causal connection is required to establish

50

a *prima facie* case of retaliation") (internal quotation marks, citation, and brackets omitted).  A causal relationship exists where a plaintiff can "show that his employer took the adverse action *because of* the protected activity."  *Roberts*, 998 F.3d at 123 (internal quotation marks and citation omitted) (emphasis in original).  In the *prima facie* stage, a plaintiff may prove causation by "(1) establishing facts supporting causation through relevant evidence, (2) demonstrating sufficient temporal proximity between the adverse action and the protected activity, or (3) some combination thereof."  *Grant*, 2024 WL 382631, at *6 (citing *Roberts*, 998 F.3d at 123).  Or a plaintiff may show that "(1) the employer either understood or should have understood the employee to be engaged in protected activity and (2) the employer took adverse action against the employee soon after becoming aware of such activity."  *Strothers*, 895 F.3d at 336.

No bright-line rule governs temporal proximity.  *Roberts*, 998 F.3d at 127. Courts find a causal relationship where the proximity between protected activity and adverse action is "very close."  *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001).  The Fourth Circuit interprets "very close" to mean that the "'adverse action occurred *shortly* after the employer became aware of the protected activity[.]'"  *Roberts*, 998 F.3d at 126 (quoting *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998)) (emphasis in original).  The greater the temporal delta between protected activity and adverse action, the weaker the inference of a causal relationship.  *See id.*; *Dowe*, 145 F.3d at 657.  Depending on the context, a months-long delay can sever the inference of a causal relationship.  *See Roberts*, 998 F.3d at 127 (collecting authority and acknowledging prior decisions explaining that "a lapse of two months between protected activity and adverse action" is long enough to "weaken significantly the inference of causation" (quotation marks and citation omitted); *id.*

(holding that a three-month gap, "particularly in the absence of any concrete, nonspeculative evidence" of the decisionmaker's awareness of protected activity, did not support a causal relationship); *but cf. Carter v. Ball*, 33 F.3d 450, 460 (4th Cir. 1994) (finding *prima facie* burden satisfied where defendant terminated plaintiff four months after filing multiple EEO complaints).

Even where insufficient on its own, temporal proximity may combine with other facts to establish causation. *See Roberts*, 998 F.3d at 126. In such cases, "courts may look to the intervening period for other evidence of retaliatory animus." *Lettieri v. Equant Inc.*, 478 F.3d 640, 650 (4th Cir. 2007) (internal quotation marks and citation omitted); *accord Holloway v. Maryland*, 32 F.4th 293, 300 (4th Cir. 2022) ("But in some case, intervening events can bridge what would otherwise be a prohibitively long temporal gap."). Evidence of "recurring retaliatory animus during the intervening period" can be persuasive enough to establish the requisite causal relationship. *Lettieri*, 478 F.3d at 650. Such animus may be discerned from a "pattern of adverse employment actions." *Grice v. Balt. Cty., Md.*, No. JFM-07-1701, 2008 WL 4849322, at *8 (D. Md. Nov. 5, 2008) (internal quotation marks and citation omitted). These actions include written reprimands, suspensions, and pay denials. *See, e.g., Vedula*, 2020 WL 5500279, at *13; *Howerton v. Bd. of Educ. of Prince George's Cnty.*, No. TDC-14-0242, 2015 WL 4994536, at *19-20 (D. Md. Aug. 19, 2015).

In *Howerton*, the court found temporal proximity where the six months between the plaintiff's EEOC charge and an adverse performance evaluation involved written reprimands and suspensions amidst a "series of protected activities" during that period. 2015 WL 4994536, at *19. The first reprimand letter arrived about one week after the EEOC filing, and the plaintiff complained in the following months that his supervisor

52

"was 'papering' his personnel file with derogatory information" and otherwise discriminating against him. *Id.* Based on that chronology and other evidence of retaliatory intent, Judge Chuang found a triable issue on the existence of a causal relationship. *Id.* at *19-20.

Here, Plaintiff provides facts supporting *prima facie* causation through temporal proximity and other considerations. Within four months of his first EEOC charge, Plaintiff received two suspensions and one reprimand. In the intervening period, he lodged multiple internal complaints and grievances accusing Devkota and Gabriel of issuing these disciplinary actions as retaliation. Later, he received multiple suspensions and reprimands within weeks or months of lodging internal complaints. As to the *prima facie* burden, the combination of temporal proximity and intervening events creates an inference of a causal relationship.

c.  <u>There is no genuine dispute of material fact regarding whether Defendants' legitimate, nondiscriminatory reasons for the adverse actions are pretextual.</u>

Moving to step two of *McDonnell Douglas*, Defendants meet their burden of providing legitimate, nondiscriminatory reasons for the actionable adverse actions. With one exception, each suspension or reprimand included an explanation of the policy Plaintiff violated and how Plaintiff's conduct violated the relevant rule or policy. This Court has long recognized that violations of company policies constitute legitimate, nondiscriminatory reasons for issuing adverse employment actions, so long as the policies do not discriminate on impermissible grounds. *See Gibson v. Marjack Co., Inc.*, 718 F. Supp. 2d 649, 656-57 (D. Md. 2010); *Cross v. Bally's Health & Tennis Corp.*, 945 F. Supp. 883, 887 (D. Md. 1996); *accord Malik v. Amazon.com Prices, LLC*, No. 3:21-cv-627-MOC-DCK, 2024 WL 150763, at *5 (M.D.N.C. Jan. 12, 2024) (citing *Farrar v.*

53

*Dorothea Dix Hosp.*, 829 F. Supp. 140, 143-44 (E.D.N.C. 1993)) ("Courts routinely recognize violation of company policy as a legitimate non-discriminatory reason for termination.").

Where the employer provides legitimate, nondiscriminatory reasons for its actions, a plaintiff must demonstrate, by a preponderance of evidence, that the offered reasons "are merely pretext for discrimination or retaliation." *Darvishian v. Geren*, 404 F. App'x 822, 828 (4th Cir. 2010) (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). Baked into this burden are two demonstrations: the falsity of the employer's reason *and* that the true reason was discrimination. *Rorie*, 653 F. Supp. 3d at 233. Showing only the first is not sufficient because the ultimate question is "'whether the plaintiff was the victim of intentional discrimination.'" *Hill*, 354 F.3d at 286 (quoting *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 153 (2000)); *see also Guessous*, 828 F.3d at 217 ("[T]he plaintiff's burden to show pretext merges with the plaintiff's ultimate burden of persuading the court that she was a victim of intentional discrimination." (internal quotation marks and citation omitted)). A plaintiff may demonstrate pretext by showing the offered reasons are "unworthy of credence in a manner that supports an inference of discrimination" or other evidence probative of intentional discrimination. *Rorie*, 653 F. Supp. 3d at 233 (citing *Dugan v. Albermarle Cnty. Sch. Bd.*, 293 F.3d 716, 721 (4th Cir. 2002)). A plaintiff may also illustrate the offered reasons were "inconsistent over time, false, or based on mistakes of fact." *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 225 (4th Cir. 2019) (citation omitted).

Plaintiff argues that Defendants' reasons are pretextual because the suspensions were eventually overturned. Opp'n at 17. In a vacuum and at first blush, that response carries intuitive (and substantial) appeal. But the Court does not view that fact (or any

other) in a vacuum.  Context and details matter here.  Every reversal occurred on procedural grounds, not substantive.  To be clear, *that* fact alone would not necessarily resolve the issue.  The inquiry here is not simply whether the disciplinary actions were procedurally proper; it is whether the Defendants' proffered reasons are *false*.  Thus, taking one step further in the search for evidence of pretext, the Court cannot ignore the fact that in overturning all but one of the suspensions, the grievance decisions exclaimed that the supervisors were justified in initiating disciplinary action.  Plaintiff neither challenges the reasons for the suspensions nor disputes engaging in the conduct that precipitated the suspensions.  Nothing in the overturning decisions or otherwise in the record undermine the credence of the reasons offered—both at the time and now—for issuing reprimands or suspensions.  Taken as a whole, Plaintiff's argument—likely stronger in another context—finds no traction with the available evidence.

The Court can envision a scenario where repeated overturned suspensions may constitute circumstantial evidence "sufficiently probative to establish intentional discrimination" or retaliation.  *Rorie*, 653 F. Supp. 3d at 233.  But this is not such a scenario.  The grievance decisions, even in finding for Plaintiff, expressly endorsed the substantive merit for the suspensions and acknowledged Plaintiff's ongoing conduct in violation of governing policies and procedures.  The Court cannot find that Plaintiff demonstrates pretext based solely on the fact of repeated overturned suspensions (and subsequent reinstatement and back pay) where the explanations of the reversals support the veracity of Defendants' legitimate, nondiscriminatory reasons.  Beyond the substance of the grievance decisions, the Court also relies on the evidence consistent with both Defendants' reasons and the substantive comments from the grievance decisions.  As one example, the saga of attempting to provide Plaintiff a computer so

that he could perform assigned tasks related to Operation Orange Cone supports the legitimate, nondiscriminatory reasons. Likewise, the record contains myriad communications reflecting how Plaintiff's actions negatively impacted the work and capacity of his colleagues. Those facts appear undisputed. In short, aside from procedural deficiencies in issuing disciplinary notices, Plaintiff offers neither facts nor law undermining any aspect of Defendants' reasons for taking adverse actions.

The Supreme Court instructs that

> an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.

*Reeves*, 530 U.S. at 148 (citations omitted). Amidst the contentious interactions, reprimands, suspensions, and grievances, the Court discerns abundant and uncontroverted evidence corroborating the legitimate, nondiscriminatory reasons Defendants offer. Against these facts tilting the scales well towards Defendants, Plaintiff's uncorroborated beliefs and personal convictions fall short. *See Gibson*, 718 F. Supp. 2d at 657 ("Rather than pointing to specific facts that cast doubt on [the employer's] proffered termination reason, [plaintiff] relies on his own unsubstantiated speculations to assert that [the supervisor] lied about her reason for terminating him, even though uncontroverted evidence in the record showed that [the employer] legitimately terminated [plaintiff] for mismanagement of invoices."); *Cross*, 945 F. Supp. at 887 (noting the employee's failure "in any way to establish that [his employer's] explanation of [plaintiff's] termination for repeated violations of the attendance policy is unworthy of credence"); *Grant*, 2024 WL 382631, at *7 ("[T]he plaintiff must set forth

56

specific, admissible evidence to show that the employer's proffered reason is false, and that it is a pretext for discrimination or retaliation.").

Because Plaintiff fails to create a triable issue on the second and third steps of *McDonnell Douglas*, the retaliation claims in Counts I through IV fail as a matter of law.

> iv. *Plaintiff fails to provide evidence demonstrating religious discrimination in violation of Title VII (Count V).*

Title VII prohibits employers from discriminating against an employee because of their religion. *See, e.g.*, 42 U.S.C. § 2000e-2(1); *Ithaca*, 849 F.2d at 118. Because he lacks evidence of intentional discrimination, *supra* Section IV.A.ii, the *McDonnell Douglas* framework applies. *See, e.g.*, *Abeles v. Metro. Wash. Airports Auth.*, 676 F. App'x 170, 174 (4th Cir. 2017). To establish a *prima facie* religious discrimination claim, a plaintiff must show "(1) membership in a protected class, (2) satisfactory job performance, (3) adverse employment action, and (4) different treatment . . . than similarly situated employees outside the protected class." *Id.* Steps two and three of *McDonnell Douglas* remain the same as articulated earlier. *See id.*

Discrimination claims may be pursued through two theories: "disparate treatment" or "failure to accommodate." *Chalmers v. Tulon Co. of Richmond*, 101 F.3d 1012, 1017 (4th Cir. 1996). Plaintiff proceeds under the "disparate treatment" theory, which requires demonstration that the employer treated the employee "differently than other employees because of [his] religious *beliefs*." *Id.* (emphasis in original). Surviving summary judgment requires evidence of satisfactory job performance as well as "direct or indirect evidence whose cumulative probative force supports a reasonable inference that [the challenged adverse action] was discriminatory." *Id.*

Defendants concede the existence of two *prima facie* elements.  MSJ at 36.  They challenge the quantum of proof regarding satisfactory job performance and differential treatment.  *Id.* at 36, 39-40.  For the following reasons, the Court grants summary judgment on the religious discrimination claim.

> a.  There exists a genuine dispute of material fact regarding Plaintiff's job performance.

Notwithstanding the lengthy history of disciplinary actions, the Court observes that a plaintiff pursuing a discrimination claim need not be "a perfect or model employee."  *Haynes*, 922 F.3d at 225.  Instead, to establish satisfactory job performance, the employee "must show only that he was qualified for the job and that he was meeting his employer's legitimate expectations."  *Id.* (citation omitted).  Courts focus on whether an employee is "performing [his] job duties at a level that met her employer's legitimate expectations *at the time of the adverse employment action*[.]"  *Rodgers*, 586 F. Supp. 3d at 438 (internal quotation marks and citation omitted) (emphasis in original).  The relevant perspective is that of the decisionmaker, not the employee.  *King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003).  Thus, an employee often defeats summary judgment on this issue by "(1) pointing out concessions by his employer that he was performing satisfactorily at the time of the dismissal; (2) offering evidence of his prior satisfactory performance reviews; or (3) providing expert testimony as to the employer's performance expectations and an analysis of his performance in light of those expectations."  *Pettis v. Nottoway Cnty. Sch. Bd.*, 980 F. Supp. 2d 717, 727 (E.D. Va. 2013) (citing *Rumsfeld*, 328 F.3d at 149-50, and then citing *Conyers v. Va. Hous. Dev. Auth.*, 927 F. Supp. 2d 285, 292 (E.D. Va. 2012), *aff'd* 533 F. App'x 342 (4th Cir. 2013)).

58

Employers wield discretion to set expectations for employee performance.  *Caban v. MET Labs., Inc.*, No. JKB-17-1872, 2019 WL 2146915, at \*9 (D. Md. May 16, 2019) (citing *Smith v. Flax*, 618 F.2d 1062, 1067 (4th Cir. 1980)).  In general, courts accept an employer's expectations as legitimate.  *Pettis*, 980 F. Supp. 2d at 725 n.5.  However, an employee may present evidence contesting the legitimacy of such expectations.  *Johnson v. Mechs. & Farmers Bank*, 309 F. App'x 675, 683 n.8 (4th Cir. 2009).  When an employee does so, courts often find expectations legitimate so long as the employee is aware of the expectations and the expectations are not pretextual or otherwise intended to obfuscate an employer's unlawful intentions.  *See Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 518 (4th Cir. 2006) (noting plaintiff's failure to show that the employer "expectations were 'a sham designed to hide the employer's discriminatory purpose' or were somehow 'not legitimate'" (quoting *Brummett v. Lee Enters.*, 284 F.3d 742, 745 (7th Cir. 2002)); *Pettis*, 980 F. Supp. 2d at 725 n.5 (quoting *Warch*, 435 F.3d at 518); *Caban*, 2019 WL 2146915, at \*10 ("[A]n employer cannot expect—not legitimately nor reasonably—that its employees will meet a policy it has not made clear.").

In examining this satisfactory performance question, the Court considers a recent decision where Judge Chasanow observed the challenges in resolving the satisfactory job performance question as a matter of law where the alleged discriminators are the same people responsible for performance assessment.  *DeSantis v. Mayor & City Council of Baltimore* No. DKC-20-3165, 2023 WL 170424, at \*9 (D. Md. Jan. 12, 2023).  The case concerned an employee with "increasingly poor performance evaluations, complaints from supervisors and coworkers, and disciplinary history" before his termination.  *Id.*  Such a record provided "serious doubt" as to satisfactory performance.  *Id.*  Yet many of those evaluations and complaints originated with those accused of

59

acting with discriminatory animus.  As result, Judge Chasanow found it "more difficult to rule out an inference of discrimination on their basis." *Id.* (citing *London v. Loyola High Sch. of Balt., Inc.*, No. DKC-17-2219, 2019 WL 4673436, at *4 (D. Md. Sept. 25, 2019), *aff'd* 806 F. App'x 255 (4th Cir. 2020)).

Like *DeSantis*, the record here includes a host of reprimands, suspensions, complaints, and other criticisms authored or otherwise influenced by the Defendants accused of discriminating against Plaintiff.  The Court recognizes the leeway Defendants have in defining their own legitimate expectations where, as here, Plaintiff was aware of them and is not alleging that such expectations are a sham.  At the same time, Devkota's role as both supervisor and alleged discriminator makes it difficult to rule out an inference of discrimination on an unlawful basis (and, as a result, take this question from a jury).  For these reasons, while the record poses challenges for Plaintiff, the Court does not resolve the Motion on this *prima facie* element.

> b.  <u>Plaintiff offers no evidence demonstrating disparate treatment from similarly situated employees outside his protected class.</u>

Instead, Defendants succeed on the fourth *prima facie* element, as there is no genuine dispute of material fact regarding whether Defendants subjected Plaintiff to different treatment from similarly situated individuals.  As an initial matter, a plaintiff is not required to identify a valid comparator in order to succeed on a religious discrimination claim if other evidence suggests discrimination.  *See Bryant v. Aiken Reg'l Med. Ctrs. Inc.*, 333 F.3d 536, 545 (4th Cir. 2003) (citation omitted).  But where a plaintiff relies on comparator evidence to establish differential treatment, the plaintiff must produce evidence that the plaintiff and comparator "'dealt with the same supervisor, [were] subject to the same standards and . . . engaged in the same conduct

without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *Haynes*, 922 F.3d at 223-24 (quoting *Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010) (alterations in original). "The similarly situated element requires a plaintiff to provide evidence that the proposed comparators are not just similar in *some* respects, but similarly-situated *in all respects*." *Cosby v. S.C. Prob., Parole & Pardon Servs.*, 93 F.4th 707, 714 (4th Cir. 2024) (internal quotation marks and citations omitted) (emphasis in original). Indeed, "[c]onclusory statements that an employer treated a plaintiff differently because of their protected class and general statements of dissimilar treatment are insufficient to show that the discrimination occurred because of the plaintiff's protected class." *Aly*, 2024 WL 2053492, at *10 (internal quotation marks and citations omitted).

As in *Aly*, Plaintiff states in conclusory fashion that Defendants treated him differently because of his Islamic religion and makes general accusations of dissimilar treatment of others. This is insufficient to raise a genuine dispute of material fact. Even if the Court viewed the facts and all reasonable inferences in the light most favorable to Plaintiff, he still fails to establish valid comparators. The only plausible comparators are Ms. Lewis, Mr. Proctor, and Mr. Suggs. But the Court finds no genuine dispute as to whether they are valid comparators. Ms. Lewis, Mr. Proctor, and Mr. Suggs did not deal with the same supervisor as Plaintiff; in fact, Plaintiff supervised them. Moreover, they were not subject to the same standards and did not engage in the same conduct. Because they were not supervisors like Plaintiff, Ms. Lewis, Mr. Proctor, and Mr. Suggs were not held to standards applicable to supervisors. Additionally, Plaintiff served as a CPS-II, while Ms. Lewis, Mr. Proctor, and Mr. Suggs were CPS-Is. These jobs entailed different responsibilities, expectations, and experiences.

At the hearing, Plaintiff drew the Court's attention to two more comparators: Tim Dominick and Saliner Kang. *See* Opp'n Ex. 37, ECF 78-37, at 3. Yet Plaintiff fails to provide the Court with sufficient evidence to determine whether these individuals are similarly situated. It is not enough to solely rely on a document—which Plaintiff does here—that alleges that the two individuals are CPS-IIs and neither received a 15-day suspension nor micromanaged to the same degree as Plaintiff. *See id.* Plaintiff advances a conclusory, unsupported position no stronger than the one *Aly* rejected. There is no basis to find these individuals are valid comparators. And, as explored above, Plaintiff has not identified other admissible evidence that suggests any of the alleged, timely raised, adverse actions were the result of religious discrimination. As a result, Plaintiff fails to demonstrate a genuine issue of material fact on this element.

> v.    *Plaintiff fails to identify evidence that could establish a hostile work environment in violation of Title VII and § 1981 (Count VI).*

To prevail on a hostile work environment claim, an employee must show harassment that is "(1) unwelcome, (2) because of religion, (3) sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere, and (4) imputable to the employer[.]" *Sunbelt*, 521 F.3d at 313 (citing *Gilliam v. S.C. Dep't of Juvenile Justice*, 474 F.3d 134, 142 (4th Cir. 2007)). A plaintiff survives summary judgment if he can show a work environment so "'permeated with discriminatory intimidation, ridicule, and insult[,]'" *Rock v. McHugh*, 819 F. Supp. 2d 456, 471-72 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)), that it "create[es] an abusive atmosphere[,]" *Sunbelt*, 521 F.3d at 316. "Unlike a typical claim of intentional discrimination based on a discrete act, a hostile-work-environment claim's 'very nature involves repeated conduct.'" *McIver v. Bridgestone Am., Inc.*, 42 F.4th 398, 407 (4th

Cir. 2022) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002)). But a discrete, "isolated" act "of harassment can amount to discriminatory changes in the terms and conditions of employment, if that incident is extremely serious." *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015) (internal quotation marks, citation, and alterations omitted). Defendants argue that Plaintiff cannot show harassment sufficiently severe or pervasive to demonstrate a hostile work environment. MSJ at 40-43.

A plaintiff "must clear a high bar in order to satisfy the severe or pervasive test." *Sunbelt*, 521 F.3d at 315. This test "has both a subjective and objective component." *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 208 (4th Cir. 2019). Specifically, an employee "must show both that [they] 'subjectively perceived the environment to be abusive' and that 'the conduct was such that a reasonable person in the plaintiff's position would have found the environment objectively hostile or abusive.'" *Miles v. DaVita Rx, LLC*, 962 F. Supp. 2d 825, 831 (D. Md. 2013) (quoting *Sunbelt*, 521 F.3d at 315). In deciding whether an environment is objectively hostile or abusive, "courts must examine the totality of the circumstances." *Strothers*, 895 F.3d at 331. This includes "the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Id.* (quoting *Forklift Sys.*, 510 U.S. at 23); *Laurent-Workman v. Wormuth*, 54 F.4th 201, 211 (4th Cir. 2022) (quoting *Okoli v. City of Balt.*, 648 F.3d 216, 220 (4th Cir. 2011))(same). "The inquiry . . . must focus on the events that the plaintiff personally experienced." *McIver*, 42 F.4th at 408 (citation omitted). "The status of the harasser is also a 'significant factor' to be considered; harassment by a

supervisor tends to be more serious, while harassment by a co-equal is less serious." *Id.* (quoting *Boyer-Liberto*, 786 F.3d at 278).

The Court finds no genuine dispute of material fact regarding whether Defendants' actions constituted severe or pervasive conduct. As an initial matter, the Court recognizes that majority, if not all, of the alleged conduct involves supervisors. This fact bodes well for Plaintiff. *See McIver*, 42 F.4th at 408. However, neither the disciplinary actions nor the security incident rise to the "high bar" of the severe or pervasive test. *Sunbelt*, 521 F.3d at 315. The suspensions and reprimands—being legitimate and nondiscriminatory actions—constituted reasonable measures in response to violations of Defendants' policies. *See Bell v. Shulkin*, 709 F. App'x 167, 170 (4th Cir. 2017) (finding that "an employer does not engage in harassment because it takes reasonable disciplinary measures"); *McCullough v. Prince George's Cnty., Md.*, No. AW-08-515, 2010 WL 723979, at *6 (D. Md. Feb. 24, 2010) (reprimands from a supervisor related to an employee's violations of the employer's policies and procedures were not severe or pervasive). Asking Plaintiff to perform certain employment tasks, and then taking adverse action when he did not, falls short of a hostile work environment. *See Tomasello v. Fairfax Cnty.*, No. 15-95, 2016 WL 165708, at *22 (E.D. Va. Jan. 13, 2016) ("requiring [an employee] to perform work assignments within [their] job duties cannot constitute a hostile work environment"); *Hemphill v. ARAMARK Corp.*, No. 12-1584-ELH, 2014 WL 1248296, at *14 (D. Md. Mar. 25, 2014) (finding that "a series of ordinary personnel decisions"—such as "the assignment of additional work," written counseling statements, and placement on a performance improvement plan—are "not objectively abusive actions" rising to the level of severe or pervasive conduct (internal quotation marks and citation omitted)). For example, Defendants cited Plaintiff for, among other

64

things, failing to update the Operation Orange Cone information, oversee funding projects, effectively communicate with supervisors, and otherwise complete his job duties. Yes, DOT overturned some of these disciplinary actions. But even where there is a pattern of allegedly undeserved discipline, Plaintiff must still provide credible evidence that such pattern is unlawful discrimination. *See Motley-Ivey*, 923 F. Supp. 2d at 234. Plaintiff fails to do so. As discussed above, he lacks evidence of intentional discrimination and any evidence that could raise a genuine dispute as to whether unlawful discrimination motivated the disciplinary actions.

The security incident does not constitute severe or pervasive conduct. Isolated incidents, unless extremely serious, do "not amount to discriminatory changes in the terms and conditions of employment." *Sunbelt*, 521 F.3d at 315 (internal quotation marks and citation omitted). "[A]n employee will have a reasonable belief that a hostile work environment is occurring based on an isolated incident if that harassment is physically threatening or humiliating." *Boyer-Liberto*, 786 F.3d at 284. "[T]he focus should be on the severity of the harassment." *Id*. (citation omitted). Therefore, as *Boyer-Liberto* encourages, the focus is on the severity of the security incident and any police report. First, while unsettling and disruptive to Plaintiff, the incident was brief, not pervasive. It appears the incident did not escalate beyond security checking the seventh floor. No evidence indicates that security apprehended Plaintiff, acted with undue aggression, or engaged in extended monitoring or harassment of him or his family. It appears to have been a relatively brief encounter. Second, three days before the meeting, Plaintiff requested and obtained a security presence during the meeting; thus, it cannot be said that the mere presence of security around the same time as the meeting created a hostile environment. In short, given the limited encounter and

65

duration, the Court does not view this isolated incident as either severe or pervasive enough to establish a hostile work environment.  Count VI must be dismissed.[19]

### B. Plaintiff cannot maintain an unjust enrichment claim (Count IX) based on compensation disagreements addressed by the City's employment policy.

Plaintiff pursues the quasi-contract theory of unjust enrichment by arguing that he conferred a benefit upon Defendants by completing work related to Operation Orange Cone.  Opp'n at 22-23.  Defendants argue that these tasks fell within Plaintiff's job duties and, even if they did not, Plaintiff failed to confer a benefit because he did not actually complete such work.  MSJ at 45-47.

Unjust enrichment is a remedy that "provide[s] relief for a plaintiff when an enforceable contract does not exist but fairness dictates that the plaintiff receive compensation for services provided."  *Dunnaville v. McCormick & Co., Inc.*, 21 F. Supp. 2d 527, 535 (D. Md. 1998).  To establish unjust enrichment, a plaintiff must show:

> (1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge by the defendant of the benefit; and (3) the acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value.

*Swedish Civil Aviation Admin. v. Project Mgmt. Enters., Inc.*, 190 F. Supp. 2d 785, 792-93 (D. Md. 2002) (citation omitted).

---

[19] Furthermore, even if the Court considered the denied pay and transfer requests in its analysis, *see* Opp'n at 19, those matters do not rise to the level of severe or pervasive conduct.  *See Brady v. Bd. of Educ. of Prince George's Cnty.*, 222 F. Supp. 3d 459, 473 (D. Md. 2016) (finding that disagreements "with the decisions or management style of one's boss" do not qualify as a hostile work environment); *Alston v. Holy Cross Health, Inc.*, No. DLB-20-2388, 2023 WL 2743332, at *14 (D. Md. Mar. 31, 2023) (recognizing that, in general, "unfavorable personnel actions" are not severe or pervasive) (internal quotation marks and citation omitted).

The Court disagrees with Defendants' second argument.  There is a clear, genuine dispute of material fact regarding whether Plaintiff conferred a benefit in this context. "To sustain an unjust enrichment claim, a plaintiff must have provided an actual benefit to the defendant." *Froelich v. Erickson*, 96 F. Supp. 2d 507, 524 (D. Md. 2000). Maryland courts broadly interpret "benefit" as "encompassing anything that 'in any way adds to the other's security or advantage.'" *Lacks v. Ultragenyx Pharm., Inc.*, 734 F. Supp. 3d 397, 437 (D. Md. 2024) (quoting Restatement (First) § 1 cmt. b); *id.* (collecting authority from Maryland courts endorsing the First Restatement's definition).  This includes "services beneficial to or at the request of the other" and activities that "save[] the other from expense or loss." *Id.* (quoting Restatement (First) § 1 cmt. b).  Plaintiff disputes Defendants' claim that he failed to complete *any* Operation Orange Cone work. The parties may differ as to how much of a benefit Plaintiff provided, but it is not undisputed that Plaintiff failed to add "in any way" to DOT's Operation Orange Cone efforts.

But the unjust enrichment claim cannot survive summary judgment because of the more fundamental flaw that his employment contract addresses the dispute driving this claim.  It is axiomatic that "a claim for unjust enrichment may not be brought where the subject matter of the claim is covered by an express contract between the parties." *FLF, Inc. v. World Pubs., Inc.*, 999 F. Supp. 640, 642 (D. Md. 1998) (citations omitted). Instead, "courts . . . allow unjust enrichment claims only when there is evidence of fraud or bad faith, there has been a breach of contract or a mutual rescission of the contract, when recission is warranted, or when the express contract does not fully address a subject matter." *Cnty. Comm'rs of Caroline Cty. v. J. Roland Dashiell & Sons, Inc.*, 358

Md. 83, 100 (Md. 2000). The Court need not determine whether the Operation Orange Cone tasks fell within Plaintiff's job duties.[20]

Instead, the claim fails because there is no material dispute that the out-of-title pay process functions to do exactly what Plaintiff attempts to accomplish with this claim: obtain compensation for the work that he believed was, to borrow a phrase, above his pay grade. Unjust enrichment is unavailable where "'an enforceable express contract regulates the relations of the parties with respect to the disputed issue.'" *J. Roland*, 358 Md. at 97 (quoting *Member Servs. Life Ins. Co. v. Am. Nat'l Bank & Tr. Co. of Sapulpa*, 130 F.3d 950, 957 (10th Cir. 1997)). Likewise, "'[t]he existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes [unjust enrichment claims] for events arising out of the same subject matter.'" *Id.* (quoting *MacDraw, Inc. v. CIT Grp. Equip. Fin., Inc.*, 157 F.3d 956, 964 (2d Cir. 1998)).

---

[20] The parties offer colorable arguments for a factfinder to consider: Plaintiff's insistence that the assignment called for calculations and techniques not usually required of a CPS-II and Defendants' view that Plaintiff's job description encompasses Operation Orange Cone tasks and that he already had—and could readily provide—the information requested from him. Regardless, Plaintiff has a high hurdle to clear. Where an express contract covers work performed by an employee, in order to allege unjust enrichment, the employee must show that "the work for which [he] believes he is entitled to . . . is [] different from the work he performed under the written contract." *Sedghi v. Patchlink Corp.*, No. JFM-07-1636, 2010 WL 3895472, at *6 (D. Md. Sept. 30, 2010). Plaintiff's job description makes no explicit reference to Operation Orange Cone. Yet some evidence suggests that Operation Orange Cone work was similar to work Plaintiff previously performed. MSJ, at 5; MSJ Ex. 6 at 2; MSJ Ex. 7 at 61; Gabriel Aff., at ¶ 6-7. Thus, the Court does not find evidence of a meaningful enough difference between that assignment and his usual assignments to justify that the Court ignore the principle of precluding unjust enrichment in the presence of an express contract. *See generally Roebuck v. Valentine-Radford, Inc.*, 956 S.W.2d 329, 332-33 (Mo. 1997) (observing that, in order to prove unjust enrichment based on services not required under an employment contract, the plaintiff must show "that the services be so different in nature from that originally agreed upon and so plainly beyond the scope of the original contract as to warrant the inference of an implied promise to pay thereof").

68

The City has a written policy that addresses employee requests for out-of-title pay. By virtue of his employment relationship with the City, Plaintiff was subject to that policy and unsuccessfully pursued additional compensation. He cannot use unjust enrichment to seek a more favorable outcome than his employment process provided. That claim must fail as a matter of law.

### C. Plaintiff fails to demonstrate genuine, material disputes on his state tort law and unpaid wages claims (Counts VII-VIII, X-XIV).

Plaintiff offered no arguments for his FLSA unpaid wages, tortious interference with prospective advantage, civil conspiracy, and defamation claims. At the hearing, Plaintiff basically admitted defeat as to these claims and the MWPCL unpaid wages claim. The Court will briefly dispose of each.

Because there is no genuine dispute regarding whether he is an exempt employee under the FLSA, Plaintiff is not entitled to overtime pay. *See Calderon v. GEICO Gen. Ins. Co.*, 809 F.3d 111, 121-22 (4th Cir. 2015); *Kreiner v. Dolgencorp, Inc.*, 841 F. Supp. 2d 897, 903 (D. Md. 2012). Plaintiff cannot recover unpaid wages from Defendants under the MWPCL because none of the accused parties is an "employer." There is no genuine dispute regarding whether Devkota and Gabriel are Plaintiff's supervisors. *See Watkins v. Brown*, 173 F. Supp. 2d 409, 415-16 (D. Md. 2001) ("The plain language, general purpose and clear intent of the MWPCL do not support an interpretation of the word 'employer' that would include a mere supervisor of another employee"). And the City, a governmental unit, "is not an 'employer' under the MWHL or the MWPCL." *Carter v. Mayor & City Council of Balt.*, No. WMN-07-3117, 2009 WL 10682095, at *3 (D. Md. June 18, 2009).

The tortious interference with prospective advantage claim cannot survive because Plaintiff fails to raise a genuine dispute regarding whether Defendants acted with malice. *See Audio Visual Assocs., Inc. v. Sharp Elecs. Corp.*, 210 F.3d 254, 261 (4th Cir. 2000); *Paccar Inc. v. Elliot Wilson Capitol Trucks LLC*, 905 F. Supp. 2d 675, 695 (D. Md. 2012). None of Defendants' alleged actions constitute independently wrongful or unlawful acts. *See Alexander & Alexander Inc. v. B. Dixon Evander & Assocs., Inc.*, 336 Md. 635, 657 (Md. 1994).

The intracorporate conspiracy doctrine bars Plaintiff's civil conspiracy claim. Plaintiff neither alleges actions taken outside of the scope of Defendants' employment nor offers evidence of exceptions to the doctrine. *See Balt.-Wash. Tel. Co. v. Hot Leads Co., LLC*, 584 F. Supp. 2d 736, 744 (D. Md. 2008).

Plaintiff's defamation claim cannot survive either because he fails to raise a genuine dispute as to whether the challenged statements were made with malice. *See Ziemkiewicz v. R+L Carriers, Inc.*, 996 F. Supp. 2d 378, 393-94 (D. Md. 2014); *Lewis v. Forest Pharm., Inc.*, 217 F. Supp. 2d 638, 658 (D. Md. 2002).

His negligence claim fails, too. Plaintiff first argues that Devkota and Gabriel's "negligent" supervisory conduct caused him injury. Opp'n at 20-22. But nothing demonstrates that Devkota and Gabriel owed him a duty of care outside the scope of the City's responsibility. *See Hastings v. Mechalske*, 336 Md. 663, 677-78 (Md. 1994). Plaintiff then argues that the City breached its duty to maintain a safe workplace by enabling Devkota to harass him unchecked. Opp'n at 20-22. Plaintiff is correct that employers owe their employees a "duty to provide a safe place to work[.]" *Hastings*, 336 Md. at 676-77. However, Plaintiff bases the City's breach on its alleged failure to restrain Fontanez and Devkota from performing discriminatory and retaliatory acts.

Opp'n at 20-21.  But the Court finds the challenged conduct not actionable under discrimination or retaliation theories.  In a similar vein, Judge Maddox recently ruled in the employer's favor on an employee's negligence claim because the employee based their claim on "various acts of racial discrimination and retaliation he claims to have suffered while working" for the employer and the court had found insufficient evidence to support the discrimination and retaliation theories.  *Evans v. Md.-Nat'l Capital Parks & Planning Comm'n.*, No. MJM-19-2651, 2023 WL 3328002, at *31 (D. Md. Mar. 31, 2023).  The same logic applies here.  Plaintiff's negligence claim against the City is based on the alleged retaliatory and discriminatory conduct of his supervisors.  As explained above, the Court grants summary judgment on these claims in Defendants' favor.  Based on how Plaintiff articulates his negligence theory, that claim suffers the same fate.

Last, having addressed all other common law claims, the negligent supervision claim no longer has any legs to stand on.  "[N]egligent supervision claims 'existed at common law' in Maryland and therefore 'may only be predicated on common law causes of action.'"  *Braxton v. Domino's Pizza LLC*, No. RDB-06-1191, 2006 WL 3780894, at *4 (D. Md. Dec. 21, 2006) (quoting *Demby v. Preston Trucking Co., Inc.*, 961 F. Supp. 873, 881-82 (D. Md. 1997)).  As a result, claims under both Title VII and § 1981 "cannot provide the basis for a negligent supervision claim under Maryland law."  *Parker v. Ciena Corp.*, No. WDQ-14-4036, 2016 WL 153035, at *7 (D. Md. Jan. 12, 2016) (citing *Brown v. The Marjack Co.*, No. AW-08-168, 2010 WL 419389, at *6 (D. Md. Jan. 29, 2010)); *see also Braxton*, 2006 WL 3780894, at *6.  Plaintiff cannot base this claim on his Title VII and § 1981 claims nor can he base it on the common law causes of action that the Court has now dismissed.

## V.   CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment (ECF 72) is **GRANTED** as to all counts of Plaintiff's Complaint.  A separate order consistent with this opinion will issue.

Date: July 1, 2026

_____/s/_____

Charles D. Austin
United States Magistrate Judge
